**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James S. DEATON; Rebecca Deaton,
Defendants–Appellants,**

The Chesapeake Bay Foundation, Incorporated; State of Maryland, Department of the Environment, Amici Supporting Appellee.

No. 02–1442.

United States Court of Appeals,
Fourth Circuit.

Argued: Dec. 5, 2002.

Decided: June 12, 2003.

**ARGUED:** Raymond Stevens Smethurst, Jr., Adkins, Potts & Smethurst, L.L.P., Salisbury, Maryland, for Appellants. James Clarke Howard, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Virginia S. Albrecht, Stephen M. Nickelsburg, Hunton & Williams, Washington, D.C.; Duane J. Desiderio, Thomas Jon Ward, National Association of Home Builders, Washington, D.C., for Appellants. Thomas M. DiBiagio, United States Attorney, Thomas L. Sansonetti, Assistant Attorney General, Greer S. Goldman, Ethan G. Shenkman, Environment & Natural Resources Division, United States Department of Justice, Baltimore, Maryland, for Appellee. Roy A. Hoagland, Denise Stranko, The Chesapeake Bay Foundation, Inc., Annapolis, Maryland; Janice L. Goldman–Carter, Edina, Minnesota, for Amicus Curiae Foundation. J. Joseph Curran, Jr., Attorney General of Maryland, Adam D. Snyder, Assistant Attorney General, Baltimore, Maryland, for Amicus Curiae State.

Before WILKINSON, LUTTIG, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge MICHAEL wrote the opinion, in which Judge WILKINSON and Judge LUTTIG joined.

## OPINION

MICHAEL, Circuit Judge:

This is the second appeal by James and Rebecca Deaton, who were sued by the government under the Clean Water Act (sometimes, "the CWA" or "the Act"), 33 U.S.C. § 1251 *et seq.*, for failing to obtain a

permit from the U.S. Army Corps of Engineers (the Corps) before digging a ditch and depositing excavated dirt in wetlands on their property. The Corps asserts jurisdiction because the Deatons' wetlands are adjacent to, and drain into, a roadside ditch whose waters eventually flow into the navigable Wicomico River and Chesapeake Bay. The Deatons' main argument is that the Corps has no authority over the roadside ditch, and thus the agency cannot regulate their wetlands. First, we hold that Congress's power under the Commerce Clause to protect navigable waters allows it to regulate the discharge of pollutants that flow into the ditch. Congress delegated part of this authority to the Corps in the Clean Water Act. The Corps, in turn, has promulgated a regulation, 33 C.F.R. § 328.3(a)(5), that extends CWA jurisdiction to tributaries of navigable waters. This regulation represents a reasonable interpretation of the CWA that is entitled to deference. The Corps interprets its regulation to cover the roadside ditch, and we also defer to that interpretation. Second, we hold that the district court did not err when it decided that the Corps used an appropriate indicator for wetland hydrology (prescribed by its Wetlands Delineation Manual) in designating parts of the Deatons' property as wetlands. Finally, we affirm the district court's remediation order, which requires the Deatons to fill in the ditch and restore their wetlands to their pre-violation condition.

## I.

The Delmarva Peninsula separates the Chesapeake Bay from the Atlantic Ocean. Since 1989 the Deatons have owned an undeveloped, twelve-acre parcel of land located roughly in the center of the peninsula, near Parsonsburg in Wicomico County, Maryland. The parcel slopes gently downhill toward a county road, Morris Leonard Road. A drainage ditch runs alongside the road between the pavement and the Deatons' property. The Deatons call the ditch the "Morris Leonard Road ditch," while the Corps calls it the "John Adkins Prong of Perdue Creek." We will call it the "roadside ditch." The parties agree that surface water from the Deatons' property drains into the roadside ditch. They disagree about how much water flows through the ditch, and how consistent the flow is, but they agree on the ditch's course. Water from the roadside ditch takes a winding, thirty-two-mile path to the Chesapeake Bay. At the northwest edge of the Deatons' property, the roadside ditch drains into a culvert under Morris Leonard Road. On the other side of the road, the culvert drains into another ditch, known as the John Adkins Prong of Perdue Creek. Perdue Creek flows into Beaverdam Creek, a natural watercourse with several dams and ponds. Beaverdam Creek is a direct tributary of the Wicomico River, which is navigable. Beaverdam Creek empties into the Wicomico River about eight miles from the Deatons' property. About twenty-five river miles further downstream, the Wicomico River flows into the Chesapeake Bay, a vast body of navigable water.

The Deatons bought the twelve-acre parcel for the purpose of developing a small (five-lot) residential subdivision. There was a problem, however, because much of the property was poorly drained. In particular, there was a large, low, wet area in the middle where water stood in the winter months and after heavy rainfall. Because of the drainage problem, the Wicomico County Health Department denied the Deatons' application for a sewage disposal permit. The Deatons then decided to dig a drainage ditch across the property. A technician from the U.S. Soil Conservation Service (SCS) advised Mr. Dea-

ton, however, that a large portion of the property contained nontidal wetlands and that he would need a permit from the Corps before undertaking any ditching work. In early 1990 the Deatons, without seeking a Corps permit, hired a contractor who dug a 1,100-foot ditch that crossed the areas of the property identified as wetlands by the SCS technician. The contractor piled the excavated dirt on either side of the ditch, a practice known as sidecasting.

The Corps learned about the Deatons' ditching project in July 1990 and promptly initiated regulatory action. The details are discussed in our prior opinion, *United States v. Deaton*, 209 F.3d 331, 333 (4th Cir.2000). In short, the Corps issued a stop-work order to the Deatons, warning them that their placement of fill material in a wetland violated § 404(a) of the Clean Water Act, 33 U.S.C. § 1344(a), and that no further work should be done without a permit. After a period of lengthy, but unsuccessful, negotiations with the Deatons, the government in 1995 filed a civil complaint alleging that the Deatons had violated the Clean Water Act by discharging fill material into regulated wetlands without a permit. The district court ultimately concluded in the first round that sidecasting did not constitute the discharge of a pollutant under the Act and granted summary judgment to the Deatons. We reversed, holding that "the Clean Water Act's definition of discharge as 'any addition of any pollutant to navigable waters' encompasses sidecasting in a wetland." *Deaton*, 209 F.3d at 337 (referring to 33 U.S.C. § 1362(12)). We remanded the case for further proceedings.

Not long after our remand order, the Supreme Court decided *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001)

(*SWANCC*). *SWANCC* held that the Corps exceeded its statutory authority under § 404(a) of the Clean Water Act when it interpreted the Act (through 33 C.F.R. § 328.3(a)(3) and the Migratory Bird Rule, 51 Fed.Reg. 41,217 (1986)) to cover an isolated, intrastate gravel pit that was filled with water and used by migratory birds. *Id.* at 162–63, 174, 121 S.Ct. 675. Because *SWANCC* provides new guidance for analyzing the Corps's jurisdiction under the Clean Water Act, the Deatons filed a motion on September 10, 2001, asking the district court to reconsider the issue of CWA jurisdiction in this case. The Deatons argued that under *SWANCC* the Clean Water Act cannot be read to extend Corps jurisdiction to their wetlands or the roadside ditch and that if the Act does extend that far, Congress exceeded its authority under the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3. On January 29, 2002, the district court entered an order denying the motion to reconsider, holding (1) that the Deatons' wetlands are adjacent to the roadside ditch, which is a tributary of navigable waters, (2) that "[b]ecause there is a hydrologic connection between the Deaton wetlands and navigable waters," *SWANCC* does not bar CWA jurisdiction, and (3) that protecting the Deatons' wetlands is reasonably related to Congress's authority under the Commerce Clause to protect navigable waters as channels of commerce. Five days later, on February 4, 2002, the district court entered a remediation order directing the Deatons to restore their property "to its pre-violation condition and elevation." The Deatons appeal these orders.

## II.

### A.

■ The Deatons' appeal of the district court's order denying their motion to reconsider Clean Water Act (or Corps) juris-

diction presents a question of law that we review de novo. *See Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir.1991). We begin with the statutory and regulatory framework for Corps jurisdiction in this case. Section 404(a) of the Clean Water Act requires a permit issued by the Secretary of the Army, through the Corps of Engineers, for the discharge of fill material into "navigable waters." 33 U.S.C. § 1344(a), (d). The Act defines "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The Corps's jurisdictional regulations define "waters of the United States" to include, among others, (i) traditional navigable waters, that is, "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," 33 C.F.R. § 328.3(a)(1), (ii) tributaries of covered waters, including traditional navigable waters, *id.* § 328.3(a)(5), and (iii) wetlands adjacent to covered waters, including tributaries, *id.* § 328.3(a)(7). The Corps asserts jurisdiction over the Deatons' wetlands because they are adjacent to the roadside ditch, which is a tributary of the Wicomico River, a traditional navigable water.

In *United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court upheld Corps regulations "requir[ing] permits for the discharge of fill material into wetlands adjacent to the 'waters of the United States.'" *Id.* at 139, 106 S.Ct. 455. Several courts have held that *SWANCC* limited this holding to wetlands adjacent to traditional navigable waters. *E.g., Rice v. Harken Exploration Co.*, 250 F.3d 264, 268–69 (5th Cir.2001); *United States v. RGM Corp.*, 222 F.Supp.2d 780, 785–86 (E.D.Va.2002); *United States v. Newdunn Assocs.*, 195 F.Supp.2d 751, 763, 767–68 (E.D.Va.2002), appeal pending sub nom. *Treacy v. Newdunn Assocs.*, No. 02–

1480(L) (4th Cir.); *United States v. Rapanos*, 190 F.Supp.2d 1011, 1015–16 (E.D.Mich.2002). The Deatons do not press for that limitation here. They argue instead that the roadside ditch is not covered by the Clean Water Act, which means that their wetlands are not adjacent to any covered water. As a result, the Deatons say, they did not need a permit to discharge fill material into their wetlands. It is undisputed that the Deatons' wetlands are adjacent to the roadside ditch. Thus, if the ditch is covered, so are the wetlands. Our analysis, then, will focus on whether the Corps has jurisdiction over the roadside ditch.

### B.

The Deatons first argue that the Corps's tributaries regulation, which interprets the Clean Water Act to reach the roadside ditch, pushes the limits of Congressional authority under the Commerce Clause and thereby raises a serious constitutional question. According to the Deatons, Congress did not give a clear indication that it intended the Act to reach tributaries so far from navigable waters, and therefore we should avoid the question of whether regulation of the ditch is constitutional by holding that Congress did not authorize it under the Act. The Deatons argue in the alternative that even if Congress authorized the Corps's regulation of the roadside ditch under the CWA, that authorization is invalid because it exceeds Congress's power under the Commerce Clause. The Corps, of course, contends that its assertion of CWA jurisdiction over the roadside ditch through its tributaries regulation, 33 C.F.R. § 328.3(a)(5), represents a proper exercise of power granted to Congress by the Constitution and delegated to the Corps. For the reasons that follow, we hold that the CWA, as implemented by

the Corps's regulation, fits comfortably within Congress's authority to regulate navigable waters.

■ The regulation reflects the Corps's interpretation of the CWA, and the Deatons' arguments require us to undertake a somewhat complicated analysis. The Deatons begin their first argument by saying that the Corps's regulation cannot survive the threshold analysis required by *SWANCC*: when "an administrative interpretation of a statute invokes the outer limits of Congress' power," the interpretation is not entitled to deference under *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), unless Congress gave "a clear indication that [it] intended that result." *SWANCC*, 531 U.S. at 172, 121 S.Ct. 675 (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). This requirement, the Court said, stems from a "prudential desire not to needlessly reach constitutional issues and [an] assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Id.* at 172–73, 121 S.Ct. 675. Moreover, "[t]his concern is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* at 173, 121 S.Ct. 675. "Thus, 'where an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Id.* at 173, 121 S.Ct. 675 (quoting *DeBartolo*, 485 U.S. at 575, 108 S.Ct. 1392).

*SWANCC* and *DeBartolo* must be read in light of *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

*See Williams v. Babbitt*, 115 F.3d 657, 661–63 (9th Cir.1997) (comparing *DeBartolo* and *Rust*). In *Rust* the Supreme Court proceeded to decide the constitutionality of an agency's regulations because, while the constitutional arguments against the regulations had "some force," the arguments did not "raise the sort of grave and doubtful constitutional questions" that would require a clear indication from Congress that it intended to authorize the agency's interpretation. *Rust*, 500 U.S. at 191, 111 S.Ct. 1759 (internal quotation marks and citation omitted). Thus, the Court said, it did not have to "invalidate the regulations in order to save the statute from unconstitutionality." *Id.* In sum, when "we do not face the sort of serious constitutional questions 'that would lead us to assume Congress did not intend to authorize [the regulation's] issuance,'" we may decide the constitutional question and proceed to the *Chevron* analysis. *Republican Nat'l Comm. v. Fed. Election Comm'n*, 76 F.3d 400, 409 (D.C.Cir.1996) (quoting *Rust*, 500 U.S. at 191, 111 S.Ct. 1759).

■ Our initial task is to determine whether the constitutional question—does the Commerce Clause give Congress authority over the roadside ditch—is serious enough to warrant rejection of the Corps's regulation. The Commerce Clause of our Constitution grants Congress authority over three distinct spheres: "[1] the use of the channels of interstate commerce ... [2] the instrumentalities of interstate commerce, or persons or things in interstate commerce ... [and 3] those activities having a substantial relation to interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The activities regulated under the third category must be "economic in nature." *United States v. Morrison*, 529 U.S. 598, 613, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). *See also GDF Realty Invs.,*

*Inc. v. Norton,* 326 F.3d 622, 633–36 (5th Cir.2003). Congress enacted the Clean Water Act under "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *SWANCC,* 531 U.S. at 172, 121 S.Ct. 675. *See also id.* at 168 n. 3, 121 S.Ct. 675. The power over navigable waters is an aspect of the authority to regulate the channels of interstate commerce. *Gibbs v. Babbitt,* 214 F.3d 483, 490–91 (4th Cir.2000) (including "navigable rivers, lakes, and canals" among the channels of commerce) (citation omitted); *United States v. Ballinger,* 312 F.3d 1264, 1269 (11th Cir.2002).

■ Congress's power over the channels of interstate commerce, unlike its power to regulate activities with a substantial relation to interstate commerce, reaches beyond the regulation of activities that are purely economic in nature. The power to regulate channels of interstate commerce allows Congress to make laws that protect the flow of commerce. *See Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 257, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (upholding congressional power to bar racial discrimination in hotels because this discrimination had a "disruptive effect . . . on commercial intercourse"); *United States v. Darby,* 312 U.S. 100, 114–15, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding congressional power to forbid interstate commerce in goods made by child labor because traffic in such goods encourages "competition . . . injurious to the commerce"). Some of the power exercised by Congress in enacting the Clean Water Act is grounded in the authority to protect the flow of commerce in "navigable waters as channels or instrumentalities of interstate commerce." *United States v. Wilson,* 133 F.3d 251, 256 (4th Cir.1997). *See also United States v. Ashland Oil & Transp. Co.,* 504 F.2d 1317, 1325–26 (6th Cir.1974)

(noting hazards to navigation posed by pollution).

The Deatons argue that the power over navigable waters is limited to legislation aimed at protecting or encouraging navigation and the flow of commerce. However, the Supreme Court cases discussing congressional power over channels of interstate commerce make clear that this view is too narrow. Congressional power to regulate the use of commercial channels goes further: "the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained. . . ." *Caminetti v. United States,* 242 U.S. 470, 491, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (quoted in *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624). In *Caminetti* the Supreme Court held that the Mann Act, which barred the transport of "any woman or girl" in interstate channels for an "immoral purpose" was within congressional authority, even though the defendant's conduct—transporting a woman across state lines to "be and become his mistress and concubine"— was entirely noncommercial. *Id.* at 483, 485, 37 S.Ct. 192; *see also Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (acknowledging congressional power to regulate "the use of channels of interstate . . . commerce which Congress deems are being misused"); *Heart of Atlanta Motel,* 379 U.S. at 256, 85 S.Ct. 348 (citing *Caminetti* ); *cf. Ballinger,* 312 F.3d at 1270 ("Congress may regulate *any* instrumentality or channel of interstate commerce. . . ."); *United States v. Horton,* 321 F.3d 476, 481 n. 3 (4th Cir.2003) (reading federal kidnapping statute as exercise of congressional power to prevent "misuse" of channels of commerce by a kidnapper trying "to cover up his trail by moving evidence of his crime into a different state's jurisdiction"). *But cf. United States v. Abdullah,* 162 F.3d 897, 901 (6th Cir.1998) (suggesting that a stat-

ute enacted under this authority must have as its purpose "to keep open the very avenues by which interstate commerce is transacted"). The Deatons are correct that many cases concerning the power over navigable waters focus on congressional authority to regulate in aid of navigation. *E.g., Gilman v. Philadelphia,* 70 U.S. (3 Wall.) 713, 724–25, 18 L.Ed. 96 (1865); *United States v. Appalachian Elec. Power Co.,* 311 U.S. 377, 404–05, 61 S.Ct. 291, 85 L.Ed. 243 (1940). But there is no reason to believe Congress has less power over navigable waters than over other interstate channels such as highways, which may be regulated to prevent their "immoral and injurious use[ ]." *Caminetti,* 242 U.S. at 491, 37 S.Ct. 192.

Congress's authority over the channels of commerce is thus broad enough to allow it to legislate, as it did in the Clean Water Act, to prevent the use of navigable waters for injurious purposes. *See Caminetti,* 242 U.S. at 491, 37 S.Ct. 192; *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624. For example, Congress may outlaw the use of navigable waters as dumping grounds for fill material. The power over navigable waters also carries with it the authority to regulate nonnavigable waters when that regulation is necessary to achieve Congressional goals in protecting navigable waters. *See Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.,* 313 U.S. 508, 525–26, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941); *United States v. Rio Grande Dam Irrigation Co.,* 174 U.S. 690, 708–09, 19 S.Ct. 770, 43 L.Ed. 1136 (1899); *see also United States v. Grand River Dam Auth.,* 363 U.S. 229, 232, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960). Any pollutant or fill material that degrades water quality in a tributary of navigable waters has the potential to move downstream and degrade the quality of the navigable waters themselves. Indeed, the principle that Congress has the

authority to regulate discharges into nonnavigable tributaries in order to protect navigable waters has long been applied to the Clean Water Act. *See, e.g., Ashland Oil,* 504 F.2d at 1325–29; *cf. United States v. Hartsell,* 127 F.3d 343, 348–49 (4th Cir.1997). The Deatons argue that their discharge (or sidecasting of dirt) into wetlands adjacent to the roadside ditch is too trivial to affect water quality in navigable waters. Congress, however, may decide that the aggregate effect of all of the individual instances of discharge, like the discharge by the Deatons, justifies regulating each of them. *See Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). And if Congress itself has the authority to make that decision, it may delegate it to the Corps, as long as it provides an "intelligible principle" to guide the agency's decisionmaking. *See, e.g., J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *Skinner v. Mid–Am. Pipeline Co.,* 490 U.S. 212, 218–24, 109 S.Ct. 1726, 104 L.Ed.2d 250 (1989); *see also Darby,* 312 U.S. at 120–21, 61 S.Ct. 451. Congress passed the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), and gave the Corps, along with the Environmental Protection Agency, the job of getting this done. The Corps has pursued this goal by regulating nonnavigable tributaries and their adjacent wetlands. This use of delegated authority is well within Congress's traditional power over navigable waters.

It follows that under the Corps's interpretation, the Clean Water Act does not invade an area of authority reserved to the states. The power to protect navigable waters is part of the commerce power given to Congress by the Constitution, and this power exists alongside the states' traditional police powers. "Although States have important interests in regulating . . .

natural resources within their borders, this authority is shared with the Federal Government when the Federal Government exercises one of its enumerated powers...." *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 204, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). *Cf. Gibbs,* 214 F.3d at 499–501 (concluding that the application of the Endangered Species Act to private land does not unconstitutionally interfere with local power over land use or wildlife); *GDF Realty Invs.,* 326 F.3d at 639 (same). The federal decision to regulate the discharge of pollutants into tributaries of navigable waters does not "significantly change[ ] the federal-state balance." *See United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).

■ In sum, the Corps's regulatory interpretation of the term "waters of the United States" as encompassing nonnavigable tributaries of navigable waters does not invoke the outer limits of Congress's power or alter the federal-state framework. The agency's interpretation of the statute therefore does not present a serious constitutional question that would cause us to assume that Congress did not intend to authorize the regulation. Indeed, as our discussion of Congress's Commerce Clause authority makes clear, the federal assertion of jurisdiction over non-navigable tributaries of navigable waters is constitutional.

### C.

The thrust of the Deatons' final argument about the Corps's jurisdiction is this: even if the Corps could regulate the roadside ditch without causing a constitutional problem, neither the Clean Water Act nor the Corps's regulation extends coverage to the ditch. Here, the Deatons make a two-part argument. First, they argue that even if the Act authorizes the Corps to regulate the nonnavigable tributaries of navigable waters, the roadside ditch is not such a tributary. They say that the ditch does not meet the definition of "tributary" at all or, alternatively, it is not a tributary of a navigable water because water flowing from the ditch must pass through several other nonnavigable watercourses before reaching the navigable Wicomico River. In short, the Deatons are arguing here that the Corps is misinterpreting its own regulation by using the tributaries provision, 33 C.F.R. § 328.3(a)(5), to assert jurisdiction over the roadside ditch. Second, they argue that if the tributary regulation does cover the ditch, the regulation is an unreasonable interpretation of the CWA. We hold that we should defer to the Corps's interpretation of its regulation to include the ditch and that the regulation, read this way, is a reasonable interpretation of the Clean Water Act.

■ This finally brings us to *Chevron,* and we analyze the Deatons' statutory and regulatory coverage arguments as follows. We begin with the first step of the *Chevron* analysis, *see* 467 U.S. at 842, 104 S.Ct. 2778, and determine whether the Clean Water Act delegates authority to the Corps to decide whether to regulate nonnavigable tributaries. Specifically, we ask "whether Congress has directly spoken to the precise question at issue." *Id.* When Congress has not spoken directly, but instead has been "silent or ambiguous" on the issue, it has by implication delegated authority to the agency charged with administering the statute, allowing the agency to clarify the ambiguity or fill the gap. *Id.* at 843–45, 104 S.Ct. 2778. *See also Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). If we conclude that the statute is silent or ambiguous, we normally move directly to the second step in the *Chevron* analysis, *see* 467 U.S. at 843, 104

S.Ct. 2778, and determine whether the agency's regulation reflects a reasonable construction of the statute, *id.*

▆ In this case, however, we are sidetracked by another issue: the meaning of the regulation itself. The Corps interprets its regulation to cover the roadside ditch, but the Deatons contend that the Corps's interpretation cannot be squared with the words of the regulation. As a result of this dispute, we must, before proceeding to *Chevron*'s step two, determine what the regulation actually means. *Kentuckians for the Commonwealth v. Rivenburgh*, 317 F.3d 425, 439 (4th Cir.2003). We give "controlling weight" to an agency's interpretation of its own regulation, "unless [the interpretation] is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). *See also Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Kentuckians*, 317 F.3d at 439; *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 221 (4th Cir.1997). If the regulation is unambiguous, then what is known as *Seminole Rock* deference does not apply, and the regulation's plain language, not the agency's interpretation, controls. *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Once we have determined what the regulation means, we can move on to the second step of *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778, and decide whether the regulation is based on a reasonable construction of the statute. *See Kentuckians*, 317 F.3d at 439–40 (combining use of *Seminole Rock* and *Chevron* tests).

We turn to the initial question of whether the statute is ambiguous. If Congress has "spoken to the precise question at issue," there is no ambiguity and thus no room for the agency interpretation. *Chev-*

*ron,* 467 U.S. at 842–43, 104 S.Ct. 2778. The precise question here is whether the Clean Water Act extends to distant, nonnavigable tributaries of navigable waters. Section 404(a) of the CWA regulates discharges into "navigable waters," 33 U.S.C. § 1344(a), and the Act defines "navigable waters" as "waters of the United States," *id.* § 1362(7). The Corps's regulations interpret the term "waters of the United States." If Congress had stopped with the basic term "navigable waters," the term used in § 404(a), 33 U.S.C. § 1344(a), many years of judicial precedent would give us the following clear meaning: "[waters] are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870). *See also Appalachian Elec. Power Co.,* 311 U.S. at 404–10, 61 S.Ct. 291. In the Clean Water Act Congress elected to redefine "navigable waters," moving away from the traditional definition. Its choice of the expansive phrase "waters of the United States" indicates an intent to "regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Riverside Bayview,* 474 U.S. at 133, 106 S.Ct. 455.

*SWANCC,* of course, emphasizes that the CWA is based on Congress's power over navigable waters, suggesting that covered non-navigable waters are those with some connection to navigable ones. *See SWANCC,* 531 U.S. at 167, 172, 121 S.Ct. 675. But we cannot tell from the Act the extent to which nonnavigable tributaries are covered. The statutory term "waters of the United States" is sufficiently ambiguous to constitute an implied delegation of authority to the Corps; this authority per-

mits the Corps to determine which waters are to be covered within the range suggested by *SWANCC.* *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 (" 'The power of an administrative agency to administer a congressionally created ... program necessarily requires ... the making of rules to fill any gap left ... by Congress.' ") (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)).

■ We next look for the meaning of the regulation promulgated under this delegated authority. Before deferring to the agency interpretation under *Seminole Rock,* we first decide whether the regulation is ambiguous. *Christensen,* 529 U.S. at 588, 120 S.Ct. 1655. The regulation, 33 C.F.R. § 328.3(a)(5), defines "waters of the United States" to include tributaries of navigable waters. The Deatons argue that it is wrong to read the regulation to reach all branches of a system that eventually flow into a navigable waterway. They contend that the term "tributary" in the regulation refers only to a nonnavigable branch that empties directly into a navigable waterway. Thus, they say, the roadside ditch is not a tributary of the navigable Wicomico River. We must decide whether this issue is settled by the plain language of the regulation.

*Webster's Third New International Dictionary* (1993) defines "tributary" as (1) "providing with or serving as a channel for supplies or additional matter" or (2) "one that is tributary to another: as ... a stream." According to this definition, "tributary" in the regulation would encompass the entire feeder system for a navigable water because even a stream many branches away eventually provides "additional matter" for the navigable water. On the other hand, *Webster's II New Riverside University Dictionary* (1988) defines tributary as "[a] river or stream flowing into a larger river or stream." Under this definition a watercourse like the roadside ditch appears to be a tributary, but it is not clear that it would be a tributary *of* a larger river several branches downstream. It could be read to mean that only streams flowing directly into a larger river are the larger river's tributaries. The dictionaries thus agree that the roadside ditch is a tributary, but they do not settle the question of whether it is a tributary of a navigable water (here, the Wicomico River), which is what the regulation covers. "The existence of alternative dictionary definitions of the word '[tributary],' each making some sense under the [regulation], itself indicates that the [regulation] is open to interpretation." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 418, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). We conclude that the regulation is ambiguous on the question of how far the coverage of tributaries extends. We therefore turn to the agency's interpretation.

The Corps asserts in its brief that "tributaries" in the regulation means "all tributaries," not just " 'short' or 'primary' tributaries." Appellee's Br. at 37. In the preamble to a prior generation of CWA regulations, the agency wrote that "Corps *jurisdiction* ... would extend to ... all tributaries (primary, secondary, tertiary, etc) of navigable waters." 40 Fed.Reg. 31,320 (1975) (emphasis added). As the Deatons point out, these old regulations cut off Corps jurisdiction at the "headwaters" of a tributary, defined by a minimum water flow that the roadside ditch would not meet. *Id.* at 31,321, 31,324. But we are concerned here with the definition of the word "tributary." Although the Corps has not always chosen to regulate all tributaries, it has always used the word to mean the entire tributary system, that is, all of the streams whose water eventually flows into navigable waters. *Cf. Headwa-*

*ters, Inc. v. Talent Irrigation Dist.* 243 F.3d 526, 533 (9th Cir.2001) (considering "tributary" to reach all branches of a system without referring to Corps's interpretation). Because the Corps's longstanding interpretation of the word "tributary" has support in the dictionary and elsewhere, it is not plainly erroneous. Nor is it inconsistent with the regulation. The interpretation is therefore entitled to *Seminole Rock* deference. In short, the word "tributaries" in the regulation means what the Corps says it means.

Now that we know the meaning of the regulation—jurisdiction extends to any branch of a tributary system that eventually flows into a navigable body of water—we can proceed to step two of the *Chevron* inquiry: is the regulation "based on a permissible construction" of the Clean Water Act. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. The Deatons rely on a passage from *SWANCC* to assert that the Corps's current jurisdictional interpretation cannot be reasonable. In *SWANCC* the Supreme Court said that the Corps had "put forth no persuasive evidence that [it] mistook Congress' intent" when it promulgated the first set of CWA regulations in 1974, shortly after the Act was passed. *SWANCC,* 531 U.S. at 168, 121 S.Ct. 675. The first regulations were narrow, reaching only navigable waters. *See* 39 Fed.Reg. 12,115, 12,119 (1974).

We do not read *SWANCC* to hold that the 1974 regulations represent the only permissible interpretation of the Clean Water Act. Those regulations captured what *SWANCC* holds to be Congress's general intent in enacting the CWA, that is, to exercise its power over navigable waters for the purpose of protecting their chemical, physical, and biological integrity. *See SWANCC,* 531 U.S. at 166, 172, 121 S.Ct. 675 (citing 33 U.S.C. § 1251(a)). In the case before us, however, our conclusion

in step one of the *Chevron* inquiry—that the CWA is ambiguous when it comes to jurisdictional coverage—shows that Congress intended to delegate authority to the Corps to decide how far coverage must extend in order to protect the navigable waters. We defer to an agency's reasonable interpretation not because the agency is in a better position to know what Congress really wanted, but "because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley,* 517 U.S. at 740–41, 116 S.Ct. 1730. Over the years, the Corps's understanding of the best way to exercise its discretion under the CWA has evolved. *See Newdunn Assocs.,* 195 F.Supp.2d at 759–62 & n. 8 (detailing changes to Corps's CWA jurisdictional regulations through revisions and interpretations in 1974, 1975, 1977, 1982, 1986, and 1990).

To conclude that the Corps's current interpretation is reasonable, "we need not find that [its interpretation] is the only permissible construction . . . but only that [the agency's] understanding of this . . . statute is a sufficiently rational one to preclude a court from substituting its judgment for [the agency's]." *Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985) (quotation marks omitted). An agency is allowed to change its mind, so long as its new interpretation is reasonable. *Smiley,* 517 U.S. at 742, 116 S.Ct. 1730. In other words, "the mere fact that an agency interpretation contradicts a prior agency position is not fatal." *Id. See also Rust,* 500 U.S. at 186–87, 111 S.Ct. 1759; *Chevron,* 467 U.S. at 863–64, 104

S.Ct. 2778; *United States v. Mead Corp.*, 533 U.S. 218, 247, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (Scalia, J., dissenting) ("Where *Chevron* applies, statutory ambiguities remain ambiguities subject to the agency's ongoing clarification."); *Piney Mtn. Coal Co. v. Mays*, 176 F.3d 753, 766–67 (4th Cir.1999); *Mass. v. FDIC*, 102 F.3d 615, 621 (1st Cir.1996). There is no suggestion that the Corps's current interpretation represents a "[s]udden and unexplained change" or that it "does not take account of legitimate reliance on prior interpretation." *Smiley*, 517 U.S. at 742, 116 S.Ct. 1730 (citing *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 670–75, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)).

■ Accordingly, if the Corps's current interpretation, 33 C.F.R. § 328.3(a)(5), is based on a reasonable construction of the statute, we will defer to the Corps. We conclude that deference is appropriate. In *Riverside Bayview* the Supreme Court concluded that the Corps regulation extending jurisdiction to adjacent wetlands was a reasonable interpretation in part because of what *SWANCC* described as "the significant nexus between the wetlands and 'navigable waters.'" *SWANCC*, 531 U.S. at 167, 121 S.Ct. 675. There is also a nexus between a navigable waterway and its nonnavigable tributaries. The Corps argues, with supporting evidence, that discharges into nonnavigable tributaries and adjacent wetlands have a substantial effect on water quality in navigable waters. The Deatons do not suggest that this effect is overstated. This nexus, in light of the "breadth of congressional concern for protection of water quality and aquatic ecosystems," *Riverside Bayview*, 474 U.S. at 133, 106 S.Ct. 455, is sufficient to allow the Corps to determine reasonably that its jurisdiction over the whole tributary system of any navigable waterway is warranted. The regulation, as the Corps reads it, reflects a reasonable interpretation of the Clean Water Act. The Act thus reaches to the roadside ditch and its adjacent wetlands.

## III.

■ The Deatons next argue that the district court erred when it held that the Corps used a correct indicator for wetland hydrology (taken from its Wetlands Delineation Manual) in designating parts of their property as wetlands. The Corps's underlying wetlands regulation, which the Deatons do not challenge, defines wetlands as "areas that are inundated or saturated by surface or ground water" and are home to "vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). To assist in applying this regulation, the Corps uses its Wetlands Delineation Manual, known as the 1987 Manual. *See* Waterways Experiment Station, Dep't of the Army, Corps of Engineers Wetlands Delineation Manual (1987). According to the manual, wetlands have "general diagnostic environmental characteristics" in the following three categories: vegetation, soil classification (hydric), and hydrology. 1987 Manual at 13–14. The Deatons do not dispute that their property meets the vegetation and soil criteria. However, they claim that their property lacks the required hydrology.

The 1987 Manual lists several methods for determining an area's hydrology, ranking them by reliability. *Id.* at 37–41. Using recorded data on water levels, flooding, and soil saturation is the most reliable method. Using field data is next. *Id.* Among the acceptable ways of gathering

field data, the second most reliable is "[v]isual observation of soil saturation," which involves digging a hole in the soil and observing water levels. In order to influence the characteristics of vegetation (and meet the wetlands hydrology criterion), water must saturate the soil "within a major portion of the root zone (usually within 12 inches of the surface)." *Id.* The Corps determined that the Deatons' property met the hydrology requirement by using the manual's visual observation method and finding that the soil was saturated to within twelve inches of the surface. The Deatons conducted their own observations, using twenty-two wells to monitor and record groundwater levels for several months. According to the Deatons, their study confirms that the areas in question were not saturated *to the surface* for a sufficient time to be considered wetlands. The Deatons rely on certain language in the manual describing wetlands hydrology as soil "saturation to the surface at some time during the growing season." 1987 Manual at 34. They therefore argue that the observation-based data showing soil saturation within twelve inches of the surface does not permit a wetlands classification and that the Corps misinterpreted the manual in making the classification. The Corps's wetlands classification, however, did not involve an interpretation (or misinterpretation) of the manual. The "within twelve inches" indicator is spelled out in the manual, and the Corps simply found this indicator to be present.

The analysis of the Deatons' attack on the Corps's reliance on the "saturation within twelve inches of the surface" indicator must begin with the Corps's wetlands regulation. Again, the regulation, 33 C.F.R. § 328.3(b), defines wetlands to include areas that are "saturated by surface or ground water." The 1987 Manual interprets the regulation. The manual states that areas with wetland hydrology include those where "soils [are] saturated to the surface at some time during the growing season." 1987 Manual at 34. The manual also states that wetland hydrology is present where the saturation has "an overriding influence on characteristics of vegetation." *Id.* Saturation to within twelve inches of the surface is usually sufficient to have an overriding impact on vegetation, according to the manual. *Id.* at 38. Finally, the presence or absence of the "within twelve inches" indicator may be determined by visual observation. *Id.* Here, the Corps simply used the manual's prescribed criterion (the "within twelve inches" indicator) and methodology (visual observation) in determining that the Deatons' property had the required hydrology for wetlands designation. If the Deatons want to argue that the "within twelve inches" criterion is inappropriate, they must argue that the manual is a flawed interpretation of the regulation defining wetlands. The Deatons, however, do not argue that the manual "is plainly erroneous or inconsistent with" the regulatory definition of wetlands. *See Seminole Rock,* 325 U.S. at 413–14, 65 S.Ct. 1215. We are therefore bound to defer to the manual's interpretation of the regulation, *id.,* especially since the interpretation deals in a complex scientific field, wetlands ecology and hydrology. *Cf. Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) (finding particular reason to extend *Chevron* deference when an agency administers a "complex and highly technical regulatory program").

IV.

Finally, the Deatons challenge the District Court's remedial order requiring them to fill in the ditch they dug across their property. The Clean Water Act only regulates the deposit of the material dug

out of the ditch, not the digging itself. Therefore, the Deatons argue, requiring them to haul the deposited dirt to a non-wetland part of the property is the proper remedy. According to the Deatons, they would not have needed a permit if they had hauled the dirt away when they dug the ditch, so the remedy for their failure to get a permit should go no further than requiring them to do what would have been lawful in the first place.

 We review the scope of a remediation order for abuse of discretion. *See Dixon v. Edwards,* 290 F.3d 699, 718 (4th Cir.2002); *see also Sasser v. Adm'r, United States EPA,* 990 F.2d 127, 130 (4th Cir.1993). In evaluating remediation or restoration proposals, courts have considered three factors: (1) whether the proposal "would confer maximum environmental benefits," (2) whether it is "achievable as a practical matter," and (3) whether it bears "an equitable relationship to the degree and kind of wrong it is intended to remedy." *United States v. Cumberland Farms of Conn., Inc.,* 826 F.2d 1151, 1164 (1st Cir.1987). *See also United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1301 (5th Cir.1976) (Rivers and Harbors Act case); *United States v. Bradshaw,* 541 F.Supp. 884, 885 (D.Md.1982). Although the district court did not consider each of these factors explicitly, it generally covered them. The court found that allowing the Deatons to haul the dirt away instead of filling the ditch would let them benefit from their violation of the Clean Water Act. Moreover, the court found it "doubtful that [removing the sidecast dirt] could be done in an ecologically harmless manner." In other words, the district court found that the Deatons' remediation proposal would likely compound the environmental damage they had already done. In light of these findings and the Clean Water Act's goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), we conclude that the district court did not abuse its discretion in entering the remediation order.

### V.

We affirm the district court's order of January 29, 2002, denying the Deatons' motion to reconsider the issue of Clean Water Act jurisdiction and that court's order of February 4, 2002, requiring remediation.

*AFFIRMED*