**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DENNIS H. TREACY, Director,
Department of Environmental Quality;
STATE WATER CONTROL BOARD,
*Plaintiffs-Appellants,*

and

UNITED STATES OF AMERICA,
*Plaintiff,*

v.

NEWDUNN ASSOCIATES, LLP; ORION
ASSOCIATES; NORTHWEST CONTRACTORS,
*Defendants-Appellees.*

MARY MARGARET WHIPPLE, Virginia
State Senator; L. PRESTON BRYANT,
Virginia State Delegate; CHESAPEAKE
BAY FOUNDATION, INCORPORATED,
*Amici Supporting Appellants.*

No. 02-1480

NATIONAL ASSOCIATION OF REALTORS;
THE NATIONAL ASSOCIATION OF HOME
BUILDERS; NFIB LEGAL FOUNDATION;
NATIONAL ASSOCIATION OF
INDUSTRIAL AND OFFICE PROPERTIES;
NATIONAL MULTI HOUSING COUNCIL;
NATIONAL APARTMENT ASSOCIATION;
REAL ESTATE ROUNDTABLE; BUILDING
INDUSTRY LEGAL DEFENSE FOUNDATION;
FOUNDATION FOR ENVIRONMENTAL AND
ECONOMIC PROGRESS; INTERNATIONAL
COUNCIL OF SHOPPING CENTERS,
*Amici Supporting Appellees.*

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellant,*

and

DENNIS H. TREACY, Director,
Department of Environmental Quality;
STATE WATER CONTROL BOARD,
                              *Plaintiffs,*

v.

NEWDUNN ASSOCIATES, LLP; ORION
ASSOCIATES; NORTHWEST CONTRACTORS,
                    *Defendants-Appellees.*

MARY MARGARET WHIPPLE, Virginia
State Senator; L. PRESTON BRYANT,
Virginia State Delegate; CHESAPEAKE
BAY FOUNDATION, INCORPORATED,
                    *Amici Supporting Appellant.*

NATIONAL ASSOCIATION OF REALTORS;
THE NATIONAL ASSOCIATION OF HOME
BUILDERS; NFIB LEGAL FOUNDATION;
NATIONAL ASSOCIATION OF
INDUSTRIAL AND OFFICE PROPERTIES;
NATIONAL MULTI HOUSING COUNCIL;
NATIONAL APARTMENT ASSOCIATION;
REAL ESTATE ROUNDTABLE; BUILDING
INDUSTRY LEGAL DEFENSE FOUNDATION;
FOUNDATION FOR ENVIRONMENTAL AND
ECONOMIC PROGRESS; INTERNATIONAL
COUNCIL OF SHOPPING CENTERS,
                    *Amici Supporting Appellees.*

No. 02-1594

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry C. Morgan, Jr., District Judge.
(CA-01-508-2, CA-01-86-4, CA-01-508)

Argued: February 25, 2003

Decided: September 10, 2003

Before GREGORY and SHEDD, Circuit Judges, and
C. Arlen BEAM, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

---

Reversed and remanded by published opinion. Judge Gregory wrote
the opinion, in which Judge Shedd and Senior Judge Beam joined.

---

## COUNSEL

**ARGUED:** Katherine J. Barton, Environment & Natural Resources
Division, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Appellant United States; John Kenneth Byrum, Jr.,
Assistant Attorney General, Richmond, Virginia, for State Appellants.
Mark Randolf Baumgartner, PENDER & COWARD, P.C., Virginia
Beach, Virginia, for Appellees. **ON BRIEF:** Thomas J. Sansonetti,
Assistant Attorney General, Ellen Durkee, Ethan G. Shenkman, Kent
E. Hanson, Environment & Natural Resources Division, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Kather-
ine D. Will, Office of General Counsel, U.S. ARMY CORPS OF
ENGINEERS, Norfolk, Virginia; Catherine Winer, Office of General
Counsel, U.S. ENVIRONMENTAL PROTECTION AGENCY,
Washington, D.C., for Appellant United States. Jerry W. Kilgore,
Attorney General of Virginia, Roger L. Chaffe, Senior Assistant
Attorney General, Rick R. Linker, Assistant Attorney General, Rich-
mond, Virginia, for State Appellants. Douglas E. Kahle, Richard H.
Matthews, PENDER & COWARD, P.C., Virginia Beach, Virginia,
for Appellees. Roy A. Hoagland, THE CHESAPEAKE BAY FOUN-
DATION, INC., Richmond, Virginia; Deborah M. Murray, SOUTH-
ERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia,
for Amici Curiae Whipple, et al. Virginia S. Albrecht, HUNTON &
WILLIAMS, Washington, D.C., for Amici Curiae Realtors, et al.

**OPINION**

GREGORY, Circuit Judge:

During the summer of 2001, without obtaining a permit from the Army Corps of Engineers (the "Corps") or the Virginia State Water Control Board (the "Board"), Newdunn Associates, Orion Associates, and Northwest Contractors (collectively "Newdunn") began ditching and draining wetlands on a forty-three-acre property near Newport News, Virginia (the "Newdunn Property"). Pursuant to its authority under the Clean Water Act ("CWA" or the "Act"), the Corps brought a civil enforcement action in federal district court. The Board initiated its own enforcement action in state court, premised on the Virginia Nontidal Wetlands Resources Act of 2000 (the "Virginia Act"). Newdunn removed the state action to federal court, and the two cases were consolidated. After a five-day bench trial, the district court ruled for Newdunn in both cases, finding that the Corps lacked jurisdiction over wetlands on the Newdunn Property under the Clean Water Act, and that the jurisdictional reach of Virginia law was merely coextensive with federal law. For the reasons stated below, we reverse.

I.

In 1978, Newdunn Associates purchased forty-three acres of land located in Newport News, Virginia. It is undisputed that approximately thirty-eight acres of the Newdunn Property (the "Newdunn Wetlands") were "wetlands," as that term is defined by the Corps in its CWA regulations. 33 C.F.R. § 328.3(b) (2002) (defining "wetlands" as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions"). Historically, before the construction of Interstate 64 ("I-64"), the wetlands on the Newdunn Property had a natural hydrologic connection to Stony Run, which is a navigable waterway-in-fact. Presently, the Newdunn Wetlands remain connected to the navigable waters of Stony Run by the intermittent flow of surface water through approximately 2.4 miles of natural streams and manmade ditches (paralleling and crossing under I-64). Silt-laden waters from the Newdunn Wet-

lands merge with clear water flowing south of the manmade ditch on the west side of I-64.

In May of 2001, following the Supreme Court's ruling in *Solid Waste Agency of N. Cook County ("SWANCC") v. United States*, 531 U.S. 159, 167 (2001), which struck down the Corps' attempted exercise of jurisdiction under its Migratory Bird Rule, Newdunn informed the Corps that it believed the Corps lacked jurisdiction over the Newdunn Property, and began filling the Newdunn Wetlands without a permit. Newdunn argued that there were no "jurisdictional" wetlands on the property, even though the property contained "scientific" wetlands. The Corps disagreed with Newdunn's interpretation of *SWANCC*, and on July 6, 2001, attempted to assert jurisdiction over wetlands on the Newdunn Property by commencing an enforcement action in federal district court, alleging violations of sections 301 and 404 of the Clean Water Act.

Based on the same activities, and pursuant to Virginia state law, the Board issued an Emergency Special Order ("ESO"), mandating that Newdunn cease stumping and grading on its property. Va. Code. Ann. § 62.1-44.15(8b). Newdunn ignored the ESO, and as a result, on August 7, 2001, the Board filed a civil enforcement action in state court, alleging violations of Va. Code Ann. §§ 62.1-44.5, 62.1-44.14, 62.1-44.15, 62.1-44.15:5, 62.1-44.23, and 62.1-44.32 (2001). Newdunn removed the Board's action to federal court. The Board, claiming that the district court was without jurisdiction to consider its case, filed a motion to remand. The court denied the Board's motion, and the Corps' and the Commonwealth's cases were consolidated for a five-day bench trial in March of 2002.

As to the federal suit, the district court held that the Corps' wetlands regulations were invalid because they exceeded Congress' grant of authority to the Corps under the Clean Water Act. On the state suit, the court ruled that the Commonwealth "has been unable to show that the Virginia Legislature has, at this time, granted regulatory authority independently of the Corps' jurisdiction." Accordingly, the district court determined that the Commonwealth lacked jurisdiction over the Newdunn Wetlands, since its authority was presumably coextensive with the Corps'. This consolidated appeal followed.

II.

We review *de novo* both the district court's statutory interpretation of the Clean Water Act, *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 448 (4th Cir. 1996), and the district court's conclusion that it had subject matter jurisdiction over the Commonwealth's enforcement action, *In re Celotex Corp.*, 124 F.3d 619, 625 (4th Cir. 1997). We review any factual findings of the district court for clear error. *Virginia Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 284 (4th Cir. 2002).

III.

A.

Before reaching the merits of either case, we must first determine whether we have jurisdiction over the Board's enforcement action premised on Virginia law. In cases where state law creates the cause of action, federal question jurisdiction is "unavailable unless it appears that some substantial, *disputed* question of federal law is a necessary element of one of the well-pleaded state claims." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 461 U.S. 1, 13 (1983) (emphasis added). For a federal issue to be both a necessary and disputed element, "the vindication of a right under state law [must] *necessarily* turn[ ] on some construction of federal law." *Id.* at 9 (emphasis added).

In the present case, the district court noted that both the Virginia state statute and the Corps' federal regulations define "wetlands" as "those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b); Va. Code Ann. § 62.1-44.3. Based on this shared scientific definition,[1]

---

[1]It is, of course, unexceptional that Virginia would elect to take advantage of the Corps' vast technical resources in elucidating the scientific meaning of "wetlands," while at the same time making its own, unrelated decision on when and where to exercise jurisdiction over those wetlands. As Henry R. Butler and Jonathan R. Macey have observed:

the district court concluded "that the state statute is coextensive with the CWA." In making this finding, however, the district court confused the definition of "scientific wetlands" and "jurisdictional wetlands."

Newdunn concedes, and the district court recognized, that at least thirty-eight acres of the Newdunn Property contained "wetlands" as that term is used in both 33 C.F.R. § 328.3(b) and Va. Code Ann. § 62.1-44.3. Thus, from a scientific perspective, there is no *disputed* federal question as to whether the Newdunn Property contains wetlands.[2] Because the resolution of this case in no way turns upon any interpretation of 33 C.F.R. § 328.3(b), there can be no federal question jurisdiction based on Virginia's decision to adopt the Corps' technical definition of wetlands. *See Franchise Tax Bd.*, 461 U.S. at

> One real source of economies of scale associated with centralization of environmental regulation could be in centralized research on technical, scientific issues that recur throughout a number of different states . . . . These economies can be realized by the federal government even when most policy-making and implementation functions are handled by the states.

Henry R. Butler & Jonathan R. Macey, *Using Federalism to Improve Environmental Policy* 26 (1996).

[2]In fact, even if this case did involve a dispute over the scientific definition of wetlands, it is doubtful that the conflict would raise a question of federal law. Importantly, the General Assembly did not reference or cite to federal law in its definition of wetlands. Rather, it merely parroted the language from the federal regulation in Va. Code Ann. § 62.1-44.3. The fact that a state law might mimic the wording of a federal law, of course, does not transform interpretation of the state statute into a federal question.

Many states, for example, have "little NEPAs" on their books, which are based on language found in federal law. *See* Bradley C. Karkkainen, "Toward a Smarter NEPA: Monitoring and Managing Government's Environmental Performance," 102 *Colum. L. Rev.* 903, 905 (2002) (noting that the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, "has inspired dozens of 'little NEPAs' at the state and local levels"). Notwithstanding the presence of mirrored language, courts applying those statutes are interpreting state, not federal, law.

9. Stated differently, the issue is not whether the Newdunn Property contains wetlands, but whether those wetlands are within the jurisdiction of the State Water Control Board. The answer to this question is resolved solely by looking to the Virginia Wetlands Resources Act of 2000, codified at Va. Code Ann. §§ 62.1-44.3, 44.5, 44.15, 44.15:5, 44.29 (2001).

The Virginia Act was crafted after this circuit announced its decision in *United States v. Wilson*, 133 F.3d 251 (4th Cir. 1997), and after the D.C. Circuit invalidated the Corps' *Tulloch* rule, which had allowed the Corps to regulate incidental fallback as a pollutant added to a wetland, *see Nat'l Mining Assoc. v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1404 (D.C. Cir. 1998). Following *Wilson* and *National Mining*, and the subsequent loss of federal control over Virginia's wetlands, nearly 10,000 acres of nontidal wetlands were drained or were set to be drained in a period of less than six months. *See* Tyler Whitley, "Nontidal Wetlands Rules Bill Expected," *Richmond Times-Dispatch*, Dec. 1, 1999, at B4.[3] Although Virginia was losing wetlands at a dramatic pace, the State Water Control Board was largely without authority to act. Interpreting then-existing state law, former Attorney General Mark Earley opined, "[T]he Board [did] not have authority to regulate wetlands beyond that contemplated by the § 401 certification process" found in the CWA. 1999 Op. Va. Att'y Gen. 179.

Subsequent to this 1999 opinion, environmentalists petitioned the Virginia General Assembly to fill the regulatory vacuum. Delegate L. Preston Bryant, Jr., responded to this call, and co-patroned a bill to provide the state with a comprehensive, nontidal wetlands permitting program. In a letter to then-Governor James S. Gilmore, III, Delegate Bryant explained the need for his proposal as follows:

> For many years, the federal wetlands permitting program has fluctuated in its ability to protect Virginia's nontidal wetlands. This fluctuation has resulted not only from chang-

---

[3]As *Wilson* and *National Mining* make clear, the district court erred when it wrongly assumed that, prior to the Supreme Court's ruling in *SWANCC*, 531 U.S. 159 (2001), the Corps enjoyed "seemingly unlimited jurisdiction."

ing administrations and policies within the federal U.S. Army Corps of Engineers, but more recently from changing federal case law . . . . *A comprehensive state program would remove the uncertainty created by changing federal policies and case law decisions*.

Letter from L. Preston Bryant, Jr., Delegate, to James S. Gilmore, III, Governor (Dec. 3, 1999) (quoted in Br. of Amici Curiae Sen. Whipple, et al. at 19). Delegate Bryant's bill was ultimately passed into law, becoming the Virginia Act at issue in this case. *See* S. 648, 2000 Gen. Assem., Reg. Sess. (Va. 2000); H.D. 1170, 2000 Gen. Assem., Reg. Sess. (Va. 2000) (amending Va. Code Ann. §§ 62.1-44.3, 44.5, 44.15, 44.15:5, 44.29). Newdunn posits that the Virginia Act was crafted narrowly to close only the *Tulloch* loophole, and not to broaden the Board's jurisdiction within the Commonwealth. The plain text of the Virginia Act, however, belies this contention. Virginia law defines "state waters" broadly to include "all water, on the surface and under the ground, wholly or partially within or bordering the Commonwealth or within its jurisdiction, *including wetlands*." Va. Code Ann. § 62.1-44.3 (emphasis added). The words "including wetlands" were added to the statute by the Virginia Act, without any jurisdictional limitation. S. 648, 2000 Gen. Assem., Reg. Sess. (Va. 2000); H.D. 1170, 2000 Gen. Assem., Reg. Sess. (Va. 2000). In "state waters," Virginia law prohibits excavating, draining, filling, dumping, or any other activity that may significantly alter or degrade a wetland without a permit issued by the Board. *See* Va. Code Ann. § 62.1-44.5. Nothing in the Virginia Act refers to the CWA's definition of "navigable waters" or the "waters of the United States." A plain reading of the Virginia Act, therefore, makes it inconceivable that the term "wetlands" as it is used in the state legislation could necessarily turn on the resolution of a question of federal law.[4]

---

[4]In fact, if there were any doubt as to the meaning of the text, the legislative history of the Virginia Act makes it abundantly clear that the legislation was crafted, not to incorporate the CWA's jurisdictional limits, but rather to remedy perceived shortcomings with the jurisdictional reach of federal law.

During the 2000 General Assembly session, legislators rejected a proposal that would have limited the Board's jurisdiction to those wetlands

Alternatively, Newdunn maintains that the Board's jurisdiction depends on a resolution of federal law because Va. Code Ann. § 62.1-44.15:5 provides: "Issuance of a Virginia Water Protection Permit shall constitute the certification required under § 401 of the Clean Water Act." Based on this statute, Newdunn posits that the Board's jurisdiction must be coextensive with the Corps'. Newdunn's theory, however, is premised on a fundamental misunderstanding of the relationship between the federal and state permitting procedures.

Section 401(a)(1) of the CWA requires an applicant for a federal permit to "provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . ." The Commonwealth, by enacting § 62.1-44.15:5, has taken advantage of this federal provision, so that when federal and state laws overlap, applicants may use their state permits to satisfy the certification requirements under section 401 of the CWA. Of course, simply because a state permit carries the added benefit of satisfying a potentially applicable federal requirement does not mean that the

---

"that are subject to federal jurisdiction under the federal Clean Water Act." *See* Legislative History of S. 695, Gen Assem. Reg. Sess. (Va. 2000), *available at* http://leg1.state.va.us/001/bil.htm; Legislative History of H.D. 1246, 2000 Gen. Assem., Reg. Sess. (Va. 2000), *available at* http://leg1.state.va.us/001/bil.htm.

Instead, lawmakers adopted an initiative that defined "wetlands" without any federal jurisdictional limitation and that was crafted not only to close the *Tulloch* loophole, but also "to protect and enhance the Commonwealth's wetland resources" by charging the Board with designing regulatory programs "to achieve no net loss of existing wetland acreage and functions." *See* Legislative History of S. 648, Gen Assem. Reg. Sess. (Va. 2000), *available at* http://leg1.state.va.us/001/bil.htm; Legislative History of H.D. 1170, 2000 Gen. Assem., Reg. Sess. (Va. 2000), *available at* http://leg1.state.va.us/001/bil.htm.

As one commenter has observed, "Under Virginia's new wetlands regulations, impacts that may have been permissible to isolated wetlands under federal regulations will be limited in Virginia. This is because Virginia includes wetlands as part of its definition of 'state waters.'" Lisa Spickler Goodwin, Annual Survey of Virginia Law: Environmental Law, 37 *U. Rich. L. Rev.* 117, 143 (2002).

state's jurisdictional reach turns on an interpretation of the CWA. Undoubtedly, situations will arise where a permittee needs a state permit, but no federal permit. In those situations, the state permitting process would apply without reference to the CWA.

As the Supreme Court of Virginia recognized, "The CWA and federal regulations allow a state program to operate a discharge elimination system program in place of the federal program, provided that the state program is authorized under state law and has standards that are *at least* as stringent as the federal ones." *State Water Control Bd. v. Smithfield Foods*, 542 S.E.2d 766, 768 (Va. 2001) (emphasis added). That is, for a state's permitting procedure to satisfy the federal requirements of 33 U.S.C. § 1342(a), the state law must be "at least" as exacting as the Clean Water Act, but of course, it may be more demanding.

Even when state and federal requirements do overlap, as was the case in *Smithfield Foods*, the issue of whether the Board has authority to regulate the subject wetlands remains a question of Virginia law. Accordingly, the Board's jurisdiction cannot "necessarily depend" on any interpretation of federal law, even if it happens that federal and state laws are coextensive on the particular facts of a certain case. *See Franchise Tax Bd.*, 461 U.S. at 13.

The Virginia Supreme Court's finding in *Smithfield Foods* that "the interests and rights of both the [federal and state] entities [we]re vested in a single permit" does not alter this analysis. *See Smithfield Foods*, 542 S.E.2d at 770. In *Smithfield Foods*, because this court had already "affirmed the finding of the district court that Smithfield was liable," and because the United States Supreme Court denied *certiorari*, the federal determination was a final judgment for the purposes of *res judicata*. *Id.* at 768. In the present case, while the Corps and the Board may ultimately require Newdunn to obtain the same discharge permit, no final judgment in either case has been rendered.

Depending upon how the Corps and Newdunn resolve the federal case on remand, the Board's interest may or may not be satisfied. Accordingly, the Board should be permitted to pursue its rights in a Virginia court. Of course, if either the state or federal actions were to result in a final judgment requiring the issuance of a permit satisfying

both federal and state laws, then Newdunn might elect to file a motion to have the unresolved action dismissed on the grounds of *res judicata*. *See Smithfield Foods*, 542 S.E.2d at 771.

In sum, in light of the Virginia Act's clear statutory language, it is apparent that "Virginia now regulates activities in wetlands beyond its federal mandate." Goodwin, Annual Survey of Virginia Law, 37 *U. Rich. L. Rev.* at 141. It would be perverse, therefore, for this court to conclude that the jurisdictional limits of the Virginia Act depend upon the CWA. Any determination as to the extent of the Board's jurisdictional reach is purely a question of state law that does not require the resolution of any federal question. Because we lack jurisdiction over the Board's action, we reverse the district court's ruling on the Board's motion to remand, and we remand the state enforcement action to the Virginia court from which it was improperly removed.

## B.

We now turn to the only case for which federal subject matter jurisdiction exists — the Corps' civil enforcement action premised on the CWA.

The Federal Water Pollution Control Amendments of 1972, known collectively as the Clean Water Act, were crafted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2002). To achieve this ambitious goal, Congress mandated that "the discharge of any pollutant by any person shall be unlawful" except as in compliance with the Act's permitting procedures. *Id.* § 1311. The permitting scheme at issue in this case is articulated in section 404(a), which gives the Corps the authority "to issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a). The CWA defines "navigable waters" to include "the waters of the United States, including the territorial seas," *id.* § 1362(7), and the Corps' regulatory jurisdiction is limited by this definition.

In 1985, the Supreme Court ruled that the Corps possessed the authority to exercise jurisdiction over wetlands that were adjacent to other waters, even though the wetlands themselves were not navigable

waters-in-fact. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139 (1985). The Court deferred to the Corps' technical expertise on the matter, noting the considerable difficulty, both for the Corps and for federal courts, in defining the jurisdictional limits of the Act. *Id.* at 132. The Court explained:

> In determining the limits of power to regulate discharges under the Act, the Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs — in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land. Where on this continuum to find the limit of "waters" is far from obvious.

*Id.* The Corps had determined that wetlands adjacent to other waters should be included in the definition of "waters of the United States," because "wetlands adjacent to lakes, rivers, streams, and other bodies of water may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water." *Id.* at 134-35. The Supreme Court upheld the Corps' exercise of jurisdiction, concluding, "We cannot say that the Corps' conclusion that adjacent wetlands are inseparably bound up with the 'waters' of the United States — based as it is on the Corps' and the EPA's technical expertise — is unreasonable." *Id.* at 134.

The Supreme Court has recently reaffirmed *Riverside Bayview Homes*, commenting: "It was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in *Riverside Bayview Homes*." *SWANCC*, 531 U.S. at 167; *see also United States v. Krilich*, 303 F.3d 784, 791 (7th Cir. 2002) (observing that the *SWANCC* Court "reaffirm[ed] its prior holding [in *Riverside Bayview Homes*] that Section 404 encompassed non-navigable wetlands adjacent to navigable waters," but "explicitly declined to further determine the exact meaning of 'navigable waters'"). In *SWANCC*, the Court struck down the Corps' so-called "Migratory Bird Rule,"

which defined "waters of the United States" to include intrastate waters, "[w]hich are or would be used as habitat by birds protected by Migratory Bird Treaties; or . . . [w]hich are or would be used as habitat by other migratory birds which cross state lines . . . ." *SWANCC*, 531 U.S. at 164 (quoting 51 Fed. Reg. 41217). Quoting *Riverside Bayview Homes*, the Court held that "Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands '*inseparably* bound up with the "waters" of the United States.'" *Id.* at 167 (emphasis added). Thus, the Corps' attempted exercise of jurisdiction over isolated ponds that had no hydrologic connection whatsoever to navigable waters could not stand.[5]

Along similar lines, this court has previously held that the phrase "waters of the United States" cannot be used by the Corps to assert jurisdiction over intrastate, nonnavigable waters, solely on the ground that those waters could possibly affect interstate commerce. *United States v. Wilson*, 133 F.3d 251, 253-54 (4th Cir. 1997). We explained, "[T]o include intrastate waters that have *nothing* to do with navigable or interstate waters, expands the statutory phrase 'waters of the United States' beyond its definitional limit." *Id.* at 257-58 (emphasis added). Accordingly, we struck down 33 C.F.R. § 328.3(a)(3), because it attempted to give the Corps jurisdiction over any waters, "the use, degradation or destruction of which could affect interstate or foreign commerce . . . ." *Id.* at 257 (quoting 33 C.F.R. § 328.3(a)(a) (1993)). As we held in *Wilson*, and as the Supreme Court affirmed in *SWANCC*, the Corps' jurisdiction does not extend to the limits of the

---

[5]As is evident from the above discussion, Newdunn's insistence that *SWANCC* limited the Corps' jurisdiction solely to those wetlands adjacent to navigable waters-in-fact is plainly incorrect. Unlike the administrative regulation at issue in *Riverside Bayview Homes*, the "Migratory Bird Rule" before the Court in *SWANCC* was not developed to clarify the scientifically nebulous point "at which water ends and land begins." *Riverside Bayview Homes*, 474 U.S. at 134. Instead, the Corps' supposed justification for the rule was purely legal — that Congress drafted the CWA with the intention of defining "waters of the United States" as broadly as possible under the Commerce Clause. The Court rejected the Corps' interpretation of the CWA, recognizing that the Corps' Commerce Clause argument would read the phrase "navigable waters" completely out of the statute. *SWANCC*, 531 U.S. at 172.

Commerce Clause. Rather, the critical, limiting term is 'navigable waters,' as that term is defined in 33 U.S.C. § 1362(7).

In the present case, the Corps asserts jurisdiction over navigable waters (33 C.F.R. § 328.3(a)(1)), tributaries of navigable waters (§ 328.3(a)(5)), and "[w]etlands adjacent to waters (other than waters that are themselves wetlands) . . ." (§ 328.3(a)(7)). The Corps defines "adjacent" to mean, "bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.3(c). This circuit has recently concluded that, pursuant to these regulations, the Corps intends to assert jurisdiction over "any branch of a tributary system that eventually flows into a navigable body of water." *United States v. Deaton*, 332 F.3d 698, 711 (4th Cir. 2003). In *Deaton*, the Corps claimed authority to regulate wetlands bordering a "roadside ditch" that took "a winding, thirty-two mile path to the Chesapeake Bay." *Id.* at 702. Along the way to the Bay, water flowed from the Deaton's wetlands to the roadside ditch, and then into a "culvert" on the other side of the road. *Id.* Water from the culvert drained into a second ditch, which flowed into Beaverdam Creek. Beaverdam Creek was "a direct tributary of the Wicomico River, which [was] navigable." *Id.* The distance from the Deaton's wetlands to a navigable-in-fact river was approximately eight miles. The *Deaton* court upheld the Corps' exercise of jurisdiction over all of these waters, finding that "the Corps's regulatory interpretation of the term 'waters of the United States' as encompassing nonnavigable tributaries of navigable waters does not invoke the outer limits of Congress's power or alter the federal-state framework." *Id.* at 708. In dismissing a Commerce Clause challenge to the Corps' regulations, the *Deaton* court summarized Congress' well-articulated purpose for crafting the CWA and concluded, "The Corps has pursued this goal by regulating nonnavigable tributaries and their adjacent wetlands. This use of delegated authority is well within Congress's traditional power over navigable waters." *Id.* at 707. In sum, the Corps' unremarkable interpretation of the term "waters of the United States" as including wetlands adjacent to tributaries of navigable waters is permissible under the CWA because pollutants added to any of these tributaries will inevitably find their way to the very waters that Congress has sought to protect.

To the extent that Newdunn challenges the Corps' decision to label the manmade, I-64 ditch a "tributary," that argument has also been foreclosed by *Deaton*. The *Deaton* court recognized that the Corps has defined the word "tributary" to include "the entire tributary system," including roadside ditches. *Id.* at 710. As explained above, *Deaton* deferred to the Corps' definition of "tributary" because "discharges into nonnavigable tributaries and adjacent wetlands have a substantial effect on water quality in navigable waters." *Id.* at 712. That the I-64 ditch at issue in the present case is a manmade rather than a natural watercourse is an irrelevant distinction. As the Corps has explained:

> The discharge of a pollutant into a waterway generally has the same effect downstream whether the waterway is natural or manmade. Indeed, given the extensive human modification of watercourses and hydrologic systems throughout the country, it would be difficult to identify a principled basis in this case for distinguishing between natural watercourses and watercourses that are wholly or partly manmade or modified.

(Br. for the United States at 48-49.) This observation is particularly meaningful in the present case, where the United States has extensively documented the connection between the Newdunn Property's wetlands and the navigable waters, both before and after the construction of I-64. Because of this longstanding connection, it would be illogical to conclude that, prior to the existence of I-64, the Newdunn Wetlands would have been within the ambit of the Corps' regulations, but that now, with the construction of the highway, the wetlands are no longer jurisdictional.

As stated before, the CWA's primary objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2002). If this court were to conclude that the I-64 ditch is not a "tributary" solely because it is manmade, the CWA's chief goal would be subverted. Whether manmade or natural, the tributary flows into traditional, navigable waters. Accordingly, the Corps may permissibly define that tributary as part of the "waters of the United States." *See* 33 U.S.C. § 1362(7).

Turning our attention to the specific wetlands at issue in this case, it is undisputed that water flows intermittently from wetlands on the Newdunn Property through a series of natural and manmade waterways, crossing under I-64, draining into the west arm of Stony Run, and eventually finding its way 2.4 miles later to traditional navigable waters. As the district court found, Stony Run is "navigable-in-fact" because the "lower reaches of Stony Run are subject to the ebb and flow of the tide." The court further found that "Stony Run flows into the Warwick River, which intersects with the James River, which intersects with the Hampton Roads Harbor, which intersects with the Chesapeake Bay." These factual findings are supported in part by photographic evidence of silt-laden water flowing from the subject property into Stony Run. Because there exists a sufficient nexus between the Newdunn Wetlands and navigable waters-in-fact, the Corps' jurisdiction in this case is amply supported by the Act and the Corps' regulations under the Act.

## IV.

For the reasons stated above, the ruling of the district court is reversed. We remand the Board's state enforcement action directly to the Virginia state court from which it was improperly removed. We remand the Corps' enforcement action to the district court for further proceedings not inconsistent with this opinion.

*REVERSED AND REMANDED*