**HEADWATERS, INC., an Oregon not for profit corporation; Oregon Natural Resources Council (ONRC) Action, an Oregon not for profit corporation, Plaintiffs–Appellants,**

v.

**TALENT IRRIGATION DISTRICT, an Oregon municipal corporation, Defendant–Appellee.**

No. 99–35373.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 2000

Filed March 12, 2001

**528**

Charles M. Tebbutt, Western Environmental Law Center, Eugene, Oregon, for the plaintiffs-appellants.

Robert L. Cowling, Hornecker, Cowling, Hassen & Heysell, Medford, Oregon, for the defendant-appellee.

Before: BOOCHEVER, TROTT, and BERZON, Circuit Judges.

BOOCHEVER, Circuit Judge:

Headwaters, Inc. and Oregon National Resources Council Action filed a citizen lawsuit against the Talent Irrigation District. The suit alleged that the irrigation district had violated the Clean Water Act by applying the aquatic herbicide Magnacide H to its canals, without obtaining a National Pollution Discharge Elimination System permit. The district court granted summary judgment in favor of the irrigation district. The court held that the canals were waters of the United States covered by the Clean Water Act, and that the active ingredient in Magnacide H was a pollutant. Nevertheless, the court concluded that no permit was required because the label on the herbicide, approved by the Environmental Protection Agency under the Federal Insecticide, Fungicide, and Rodenticide Act, did not require the user to acquire a permit. Because we conclude that the approved label did not obviate the need to obtain a permit, we reverse.

### FACTS

The Talent Irrigation District ("TID") operates a system of irrigation canals in Jackson County, Oregon. The canals derive water from a variety of surface streams and other bodies of water, including Bear Creek, Emigrant Lake, Wagner Creek, and Anderson Creek. The canals also divert water to such streams as Bear Creek, Wagner Creek, Anderson Creek, Coleman Creek, Dark Hollow Creek, and Butler Creek. [ER pp. 53–56]

TID provides irrigation waters to its members from May to September or October. To control the growth of aquatic weeds and vegetation in its irrigation canals, TID uses an aquatic herbicide, Magnacide H, which it applies to the canals with a hose from a tank on top of a truck every two weeks from late spring to early fall. The active ingredient in Magnacide H is acrolein, an acutely toxic chemical that kills fish and other wildlife. TID does not have, and has never applied for, a National Pollution Discharge Elimination System permit ("NPDES permit" or "permit") issued under the Clean Water Act, 33 U.S.C. § 1342.

In May 1996, TID applied Magnacide H to the Talent Canal, and the next day the Oregon Department of Fish and Wildlife found many dead fish in nearby Bear Creek, around and downstream from a leaking waste gate from the canal. Over 92,000 juvenile steelhead were killed. An earlier fish kill in Bear Creek followed an application of Magnacide in 1983. [ER pp. 34–35]

On January 5, 1998, Headwaters, Inc. and Oregon Natural Resources Council Action (hereafter referred to as "Headwaters" or "plaintiffs"), nonprofit environmental corporations whose members use

the streams near TID's canals, brought a citizen suit under the Clean Water Act ("CWA"), 33 U.S.C. § 1365. The complaint alleged that TID is in violation of the CWA, 33 U.S.C. § 1311, when it discharges the toxic chemical into the irrigation canals, and through the canals into Bear Creek, without a permit under 33 U.S.C. § 1342. [ER pp. 8–10] The complaint asked for a declaratory judgment, an injunction prohibiting TID from discharging pollutants without a permit, and an injunction requiring TID to allow the plaintiffs to monitor further discharges. The complaint also asked for an injunction requiring TID to pay for environmental restoration, as well as civil penalties and the plaintiffs' costs and attorneys fees.

Headwaters filed a motion for partial summary judgment on liability, and TID filed a cross-motion. The district court granted TID's cross-motion. The court held that Headwaters had standing to bring a citizen's suit under the CWA; that the irrigation canals were "waters of the United States" subject to the Act; and that Magnacide H (with its active chemical ingredient acrolein) is a "pollutant" under 33 U.S.C. § 1362. But the court also concluded that no NPDES permit was necessary: "[T]he application of acrolein is adequately regulated and controlled by [the Federal Insecticide Fungicide and Rodenticide Act] and the EPA thus making further regulation by the [CWA] unnecessary." [ER p. 130] Because the EPA-approved label on Magnacide H did not require a permit, the court held that none was required. The court further concluded that the application by TID of Magnacide H complied with the FIFRA label and that acrolein had not "recently" leaked from the irrigation canals into "natural waterways." [ER p. 135] The court denied relief to the plaintiffs, but recommended they petition the EPA to amend the label to require a permit. This appeal followed.

## ANALYSIS

■ We review the district court's grant of summary judgment de novo. *See Boto-*

*san v. Paul McNally Realty*, 216 F.3d 827, 830 (9th Cir.2000).

### I. *Subject matter jurisdiction*

TID argues on appeal that the district court had no jurisdiction because the suit was based on wholly past violations of the CWA. "The Clean Water Act does not permit citizen suits for wholly past violations." *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1143 (9th Cir.1998) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)). Nevertheless, a citizen group has "standing to seek penalties for violations that are ongoing at the time of the complaint and that could continue into the future if undeterred." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693, 708, 145 L.Ed.2d 610 (2000); *see Russian River*, 142 F.3d at 1143 ("appellants must prove the existence of ongoing violations or the reasonable likelihood of continuing future violations").

■ The complaint alleges that TID's application of Magnacide H to its irrigation canals, without a permit, violates the CWA. There is no factual dispute that TID continues to apply Magnacide H to its canals without a permit. The plaintiffs' claim is thus based on a continuing violation.

The complaint also alleges that Magnacide H reaches Bear Creek. TID claims that it has implemented a new protocol, and that since the complaint was filed there have been no leaks into Bear Creek and "no releases are likely to occur." But the claimed violation of the Clean Water Act is the continuing discharge of the herbicide into the canals without a permit, regardless of whether the herbicide continues to cause environmental damage to any of the numerous streams with which the canals exchange water.

We conclude that we have subject matter jurisdiction.

## II. *EPA-approved label under FIFRA*

The Clean Water Act, as originated in the Federal Water Pollution Control Act Amendments of 1972, generally prohibits the discharge of pollutants into "navigable waters" or "waters of the United States." *See* 33 U.S.C. §§ 1311(a), 1362(7). There are statutory exceptions, however, the broadest of which is the National Pollution Discharge Elimination System ("NPDES") permit program, which allows a polluter who obtains a permit to discharge a specified amount of the pollutant. *See id.* at § 1342; *Russian River*, 142 F.3d at 1138. Under the NPDES program, 33 U.S.C. § 1342, the EPA may establish a uniform national limitation on the discharge of an identified pollutant from categories of sources, but the EPA may also issue permits on a case-by-case basis, taking into account local environmental conditions. *See American Mining Cong. v. United States Envtl. Prot. Agency*, 965 F.2d 759, 762 n. 3 (9th Cir.1992); *United States v. Pozsgai*, 999 F.2d 719, 725 (3d Cir.1993) ("The permit system translates [national effluent] standards into site-specific limitations to accommodate individual circumstances and ease enforcement."). TID does not have, and has never applied for, such a permit.

TID claims that it does not need a permit, because Magnacide H's label does not mention any permit requirement, and the label was approved by the EPA under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").

FIFRA, codified at 7 U.S.C. §§ 136–136(y), "is a comprehensive federal statute which regulates pesticide use, sales, and labeling, and grants enforcement authority to the EPA." *Taylor AG Indus. v. Pure–Gro*, 54 F.3d 555, 559 (9th Cir.1995); *see also Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 601, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). The statute creates a comprehensive regulatory scheme for the labeling of pesticides and herbicides, requiring that all herbicides sold in the United States be registered with the EPA. *See Andrus v. AgrEvo USA Co.*, 178 F.3d 395, 398 (5th Cir.1999). After a complex review process, the EPA may approve a label under which the product is to be marketed. *See* 7 U.S.C. § 136a.

> The EPA then registers the herbicide if it determines that its composition is such as to warrant the proposed claims for it, that its labeling complies with FIFRA requirements, that it will perform its intended function without unreasonable adverse effects on the environment, and, when used in accordance with widespread practice, that it will not generally cause unreasonable adverse effects on the environment.

*Andrus*, 178 F.3d at 398 (citing 7 U.S.C. § 136a(c)(5)). The labels must be nationally uniform. *See* 7 U.S.C. § 136(v).

Magnacide H is registered under FIFRA and bears an EPA-approved label. [ER p. 40] The label states that the herbicide is toxic to fish and wildlife, should be kept out of lakes, streams, or ponds, and should not be applied to drainage areas where runoff or flooding will contaminate other bodies of water. The "Directions for Use" warn against release into potential sources of drinking water, and conclude, "Do not release treated water for 6 days after application into any fish bearing waters or where it will drain into them." The label does not state that a NPDES permit is required for the use of Magnacide–H. The district court construed the label's failure to mention a permit as an indication that none was required.

To resolve whether a FIFRA label controls whether a permit is required under the CWA, we must interpret the two statutes "to give effect to each if we can do so while preserving their sense and purpose. When two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Resource Invs., Inc. v. U.S. Army Corps of Eng'rs*, 151

F.3d 1162, 1165 (9th Cir.1998) (quotations and internal alteration omitted).

The CWA and FIFRA have different, although complementary, purposes. The CWA's objective "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), and to that end the statute requires a NPDES permit before any pollutant can be discharged into navigable waters from a point source. *See* 33 U.S.C. § 1342(1). FIFRA's objective is to protect human health and the environment from harm from pesticides, and to that end the statute establishes a nationally uniform pesticide labeling system requiring the registration of all pesticides and herbicides sold in the United States and requiring users to comply with the national label. *See* 7 U.S.C. § 136a, 136j(a)(2)(G).

Even this cursory review of the statutes reveals that a FIFRA label and a NPDES permit serve different purposes. FIFRA establishes a nationally uniform labeling system to regulate pesticide use, but does not establish a system for granting permits for individual applications of herbicides. The CWA establishes national effluent standards to regulate the discharge of all pollutants into the waters of the United States, but also establishes a permit program that allows, under certain circumstances, individual discharges. FIFRA's labels are the same nationwide, and so the statute does not and cannot consider local environmental conditions. By contrast, the NPDES program under the CWA does just that.

The facts in this case illustrate the way in which the statutes differ. When TID applies Magnacide H to its irrigation canals, it is required to follow the directions on a label that is the same across the United States no matter where Magnacide H is applied. The application of Magnacide H in the Talent Canal, however, even if done in compliance with the label, may have effects that depend on local environmental conditions and that will not be duplicated in other areas. The label's general rules for applying the herbicide must be observed under FIFRA, but where the herbicide will enter waters of the United States, FIFRA provides no method for analyzing the local impact and regulating the discharge from a particular point source. The NPDES permit requirement under the CWA thus provides the local monitoring that FIFRA does not. *See Wisconsin Pub. Intervenor,* 501 U.S. at 614, 111 S.Ct. 2476 (FIFRA does not preempt entire field of pesticide regulation, but instead leaves room for local ordinances requiring permit before pesticide use).

In an amicus brief filed by the United States, the EPA describes the different analyses required by the statute:

> In approving the registration of th[e] pesticide, EPA concluded that the overall economic benefits of allowing the use of the product outweigh adverse environmental effects. EPA did not analyze, was not required to analyze, and could not feasibly have analyzed, whether, or under what conditions, the product could be discharged from a point source into particular public water bodies in compliance with the CWA. In approving the registration of Magnacide H, EPA did not warrant that a user's compliance with the pesticide label instructions would satisfy all other federal environmental laws. Indeed, EPA approves pesticides under FIFRA with the knowledge that pesticides containing pollutants may be discharged from point sources into the navigable waters only pursuant to a properly issued CWA permit.

[Amicus Curiae Brief of the United States p. 12]

This agency position is entitled to some deference. *See Resource Invs.,* 151 F.3d at 1165 (agency's construction of statute it is charged with enforcing is normally entitled to deference if reasonable and not in conflict with Congressional intent). Although "this deference does not extend to

agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice," *id.* (quotations omitted), the EPA's position is not without support. In 1995, the EPA issued a public notice that a label's failure to include the possible need for a NPDES permit "does not relieve a producer or user of such products from the requirements of the Clean Water Act." Pesticide Regulation (PR) Notice 95–1 (May 1, 1995).

This court has already held that registration under FIFRA is inadequate to address environmental concerns under the National Environmental Policy Act, 42 U.S.C. §§ 431–435. *See Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588, 595 (9th Cir.1988) (herbicide); *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1248 (9th Cir.1984) (herbicide); *Oregon Envtl. Council v. Kunzman,* 714 F.2d 901, 905 (9th Cir.1983) (pesticide). "FIFRA registration is a cost-benefit analysis that no unreasonable risk exists to man or the environment taking into account the economic, social and environmental costs and benefits of the use of any pesticide." *Save Our Ecosystems,* 747 F.2d at 1248 (quotation omitted). In contrast, the granting of a NPDES permit under the CWA is not based on a cost-benefit analysis, but rather on a determination that the discharge of a pollutant satisfies the EPA's effluent limitations, imposed to protect water quality. *See* 33 U.S.C. § 1342(a) (permit conditioned on discharge meeting CWA's effluent limitations).

■ We conclude that the registration and labeling of Magnacide H under FIFRA does not preclude the need for a permit under the CWA. The label's failure to specify that a permit is required does not mean that the CWA does not apply to the discharge of Magnacide–H.

III. *"Discharge" of a "pollutant" into "waters of the United States"*

■ To establish a violation of the CWA's NPDES permit requirement, a plaintiff must show that defendants (1) discharged (2) a pollutant (3) to navigable waters (4) from a point source. *See Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.,* 13 F.3d 305, 308 (9th Cir.1993). The CWA defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7). The district court held that Magnacide H is a pollutant (and by implication that it is discharged into the canals), and that the irrigation canals are "waters of the United States" under the CWA. The only element not disputed by TID is that the Magnacide H flowed from a "point source," the hose that delivered the herbicide to the canals.

A. *Discharge*

■ TID's direct application of acrolein into the irrigation canals qualifies as a "discharge" because, as discussed below, we conclude that the canals themselves are "waters of the United States." Further, acrolein has at least once—and according to the allegations in the complaint, more than once—leaked from the canals into Bear Creek, constituting a "discharge" into those waters. *See Mokelumne River,* 13 F.3d at 308–09 (discharge of pollutant took place when contaminated water collected in reservoir from time to time passed over spillway or valve into river).

B. *Pollutant*

TID claims that Magnacide–H is not a pollutant, because it is a chemical applied to the canals for a beneficial purpose, the clearing of weeds. TID points to the CWA's definition of a "pollutant," which includes "chemical wastes" but not "chemicals." 33 U.S.C. § 1362(6).

■ The active ingredient in Magnacide H is acrolein, a toxic chemical that is lethal to fish at a concentration at and below the level required to kill weeds in the irrigation canals, and which takes at least several days to break down into a nontoxic state. Although it would seem absurd to conclude that a toxic chemical directly

poured into water is not a pollutant, we need not decide that issue because we agree with the district court that the residual acrolein left in the water after its application qualifies as a chemical waste product and thus as a "pollutant" under the CWA. *See Hudson River Fishermen's Ass'n v. City of New York*, 751 F.Supp. 1088, 1101–02 (S.D.N.Y.1990), *aff'd*, 940 F.2d 649 (2d Cir.1991) (residual of chemical is "pollutant" even if its earlier use is beneficial).

### C. Navigable waters/waters of the United States

The EPA has interpreted "waters of the United States" to include "intrastate lakes, rivers, streams (including intermittent streams) ... the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce," and "tributaries of [those] waters." 40 C.F.R. § 122.2(c), (e). The district court concluded that the irrigation canals were "waters of the United States" because they are tributaries to the natural streams with which they exchange water.

■ We agree with the district court. By TID's own admission the irrigation canals exchange water with a number of natural streams and at least one lake, which no one disputes are "waters of the United States." A "stream which contributes its flow to a larger stream or other body of water" is a tributary. *Random House College Dictionary* 1402 (rev. ed. 1980). As tributaries, the canals are "waters of the United States," and are subject to the CWA and its permit requirement. *See United States v. Eidson*, 108 F.3d 1336, 1341–42 (11th Cir.1997) (tributaries are "waters of the United States," and manmade ditches and canals that flow intermittently into creek may be tributaries); *United States v. TGR Corp.*, 171 F.3d 762, 764 (2d Cir.1999) (non-navigable tributaries flowing into navigable streams are "waters of the United States"); *United States v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir.1979) (unnamed tributary of

creek that is tributary to river is "water of the United States").

Our conclusion is not affected by the Supreme Court's recent limitation on the meaning of "navigable waters" in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001). The Court invalidated a 1986 Army Corps of Engineers promulgation known as the "Migratory Bird Rule," which included in "waters of the United States" intrastate waters with no connection to any navigable waters, but which were or would be used as habitat by migratory birds. *See* 51 Fed. Reg. 41206, 41217 (1986) (setting out Corps' interpretation). The Court rejected the Corps' argument that "isolated ponds, some only seasonal, wholly located within two Illinois counties, fall under [the] definition of 'navigable waters' because they serve as habitat for migratory birds," holding that such an interpretation exceeded the Corps' authority under the CWA and "imping[ed] the States' traditional and primary power over land and water use." 121 S.Ct. at 682, 684.

■ The irrigation canals in this case are not "isolated waters" such as those that the Court concluded were outside the jurisdiction of the Clean Water Act. Because the canals receive water from natural streams and lakes, and divert water to streams and creeks, they are connected as tributaries to other "waters of the United States." TID claims that the canals are not tributaries because, during the application of Magnacide H, the canals are a "closed system," isolated from natural streams by a system of closed waste gates. It is a disputed question of fact whether those waste gates are effective, and whether the system is ever entirely sealed off during application of the herbicide. Certainly when the leaks into local creeks killed fish in 1996 and 1983, the system failed to contain the treated water. TID points to a new "protocol" in place that it claims will result in no leakages during

treatment. But even if TID succeeds, at certain times, in preventing the canals from exchanging any water with the local streams and lakes, that does not prevent the canals from being "waters of the United States" for which a permit is necessary. Even tributaries that flow intermittently are "waters of the United States." As the Eleventh Circuit stated:

> Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage.... [I]t makes no difference that a stream was or was not at the time of the spill discharging water continuously into a river navigable in the traditional sense. Rather, as long as the tributary would flow into the navigable body [under certain conditions], it is capable of spreading environmental damage and is thus a "water of the United States" under the Act.

*Eidson*, 108 F.3d at 1342 (internal quotations and citations omitted) (holding that drainage ditch connected to sewer drain and running into canal eventually leading to Tampa Bay was "water of the United States"); *see Driscoll v. Adams*, 181 F.3d 1285, 1291 (11th Cir.1999) (small-volume stream running only intermittently is "navigable water"); *Quivira Mining Co. v. United States Envtl. Prot. Agency*, 765 F.2d 126, 130 (10th Cir.1985) (creeks and arroyos connected to streams during intense rainfall are "waters of the United States"); *Texas Pipe Line Co.*, 611 F.2d at 347 (oil spill into tributary involved "wa-ters of the United States," even though there was no evidence that streams that connected the tributary with navigable waters were running at time of spill); *United States v. Ashland Oil and Transp. Co.*, 504 F.2d 1317, 1329 (6th Cir.1974) (to establish violation of Clean Water Act it is enough to show that defendant discharged pollutants into tributary that is "water of United States;" there is no threshold requirement to prove "that, in fact, the [pollutant] reached and polluted the navigable river"). The Clean Water Act is concerned with the pollution of tributaries as well as with the pollution of navigable streams, and "it is incontestable that substantial pollution of one not only may but very probably will affect the other." *Id.*

## CONCLUSION

The EPA-approved label under FIFRA did not eliminate TID's obligation to obtain a NPDES permit. We reverse the district court's grant of summary judgment in favor of TID and its dismissal of the case, and remand for entry of partial summary judgment in favor of Headwaters and for further proceedings on damages and injunctive relief.