**UNITED STATES of America,**
**Plaintiff,**

v.

**ADAM BROS. FARMING, INC.; Iceberg Holdings, L.P.; Richard Adam; Peter Adam; Kieran Adam; and Dominic Adam, Defendants.**

No. CV00–07409CASRNBX.

United States District Court,
C.D. California,
Western Division.

Dec. 8, 2003.

H. Michael Semler, Lily N. Chinn, and Martha C. Mann of the U.S. Department of Justice Environmental Defense Section, Washington, DC, for Plaintiff United States.

Richard P. Crane and Suzanne M. Henry of Musick, Peeler & Garrett, Los Angeles, CA, David E. Dearing, Indianapolis, IN, for Defendants Adam Bros. Farming Inc. et al.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: CLEAN WATER ACT JURISDICTION

SNYDER, District Judge.

The Court previously trifurcated the issues to be tried in this case. The first phase which addressed the question of whether jurisdiction exists under the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA") was tried to the Court on February 6, February 7, February 11, February 12, February 13, February 14, February 20, February 26, and February 27, 2003. Thirteen witnesses testified and 136 exhibits were admitted into evidence. H. Michael Semler, Marsha Mann and Lily Chinn appeared for plaintiff United States of America and Richard P. Crane, Suzanne M. Henry and David E. Dearing appeared for defendants. The Court now makes its findings of fact and conclusions of law.

## I. INTRODUCTION

The present case is brought by the United States under the CWA. The government filed its complaint on July 7, 2000, alleging that defendants Richard Adam, his sons Peter, Kieran and Dominic Adam, and the family's businesses, Adam Brothers Farming, Inc., and Iceberg Holdings, L.P., violated the CWA by draining, filling and grading wetlands and channelizing a creek on their property without a permit from the United States Army Corps of Engineers (the "Corps").

## II. BACKGROUND

Defendants are the owners of land located near the community of Orcutt in Santa Barbara County, California (the "Site").[1]

---

1. Defendants contend that the Site comprises approximately 260 acres. *See* Tr. 2/6/03 at 12–14. Defendants state that the property was purchased on or about November 17, 1997 with the intention of farming it and growing vegetable crops such as broccoli, lettuce, cauliflower and celery on the Site. *See* Defendants' Proposed Findings of Fact and Conclusions of Law ¶¶ 6, 7.

Orcutt Creek, which the parties variously describe as an intermittent stream, an ephemeral stream, and a flood channel, traverses the Site from east to west. In 1998 and 1999, defendants allegedly engaged in activities which altered the hydrology of the Site and had an adverse environmental impact on it. *See* Tr. 2/06/03 at 10:15–17. These activities allegedly included discharging dredge and fill materials into Orcutt Creek and wetlands adjacent to Orcutt Creek without a permit. *Id.*.

According to plaintiff, defendants were required to, but did not, obtain a permit from the Corps pursuant to section 404 of the CWA before discharging dredge and fill material into environmentally sensitive areas. Tr. 2/06/03 at 18:13–16. On July 7, 2000, plaintiff commenced this action, alleging claims for unlawful discharge of dredged and fill material and failure to comply with a remediation order.

Defendants filed a motion for summary judgment on December 19, 2001, on the ground that the Corps lacks regulatory jurisdiction pursuant to section 404 of the CWA over the Site. In an order dated July 12, 2002, the Court denied defendants' motion for summary judgment. The Court found that there was a genuine issue of material fact as to whether pumping water from the Orcutt Creek channel into a reservoir which sometimes flows onward to the Santa Maria River creates a sufficient hydrological connection with waters of the United States to give rise to CWA jurisdiction. Because the Court found a genuine issue of material fact as to whether pumping alone creates a hydrological connection, the Court did not reach the question of whether a genuine issue of material fact

exists as to the flow of water from Orcutt Creek into the Pacific Ocean absent any pumping. Finally, the Court found that plaintiff failed to establish the existence of a genuine issue of material fact as to the historical connection of the Betteravia Lakes area and watersheds to the west which ultimately flow to the Pacific Ocean, and granted summary adjudication in favor of defendants on this issue.

## III. DISCUSSION

Section 301(a) of the CWA prohibits the "discharge of any pollutant" into navigable waters unless authorized by permit or statutory exception. 33 U.S.C. § 1311(a). The term "pollutant" is defined to include, among other things, "rock," "sand," and "dredged soil." *Id.* § 1362(6). A "discharge" is "any addition" of a pollutant to navigable waters from "any point source." *Id.* § 1362(12).[2] "Navigable waters" are defined by the CWA as encompassing all "waters of the United States." 33 U.S.C. § 1362(7).

Pursuant to CWA § 404, the Corps may issue permits authorizing the discharge of dredged or fill material into waters of the United States, where such discharges are not inconsistent with the public interest, 33 U.S.C. § 1344(a). The Corps and the EPA are jointly charged with enforcing § 404 of the CWA. As defined in the governing regulations of both agencies, "waters of the United States" include, *inter alia:*

> (a)(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; . . .

---

**2.** "Point source" includes "any discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14). The Ninth Circuit has held that earth-moving equipment, including bulldozers and backhoes, can constitute a point source. *See, e.g., Borden Ranch Partnership v. United States Army Corps of Engineers,* 261 F.3d 810, 815 (9th Cir.2001) ("deep ripping" of soil by bulldozers falls within CWA's definition of point source).

(5) Tributaries of waters identified in paragraphs (a)(1) through (4) of this section; ...

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section.

33 C.F.R. § 328.3(a)(1), (5) and (7).[3]

In *Solid Waste Agency of Northern Cook County v. Army Corp of Engineers* ("*SWANCC*"), 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), the Corps sought to justify the exercise of jurisdiction over ponds that had formed in trenches created by an abandoned gravel and sand mining operation, arguing that it had regulatory jurisdiction over the ponds under the CWA by reason of the fact that they provided a habitat for migratory birds. *SWANCC*, 531 U.S. at 163–64, 121 S.Ct. 675. The Corps asserted that the ponds were "waters of the United States" because one of its regulations, 33 C.F.R. § 328.3(a)(3), provided that "waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce" constitute waters of the United States. According to another Corps regulation, the so-called "Migratory Bird Rule," Corps' regulatory jurisdiction extended to intrastate waters "[w]hich are or would be used as habitat by birds protected by Migratory Bird Treaties," or "[w]hich are or would be used as habitat by other migratory birds which cross state lines...." 51 Fed.Reg. 41217. The Supreme Court held that the Corps did not have regulatory jurisdiction over the ponds pursuant to CWA § 404(a), because 33 C.F.R. § 328.3(a)(3), as further interpreted by the Migratory Bird Rule,

was based on an impermissibly broad interpretation of "waters of the United States," in that it allowed for jurisdiction to be asserted over wetlands and bodies of water with no "significant nexus" to traditional navigable waters. *Id.* at 167, 121 S.Ct. 675. The Supreme Court held that the Corps' interpretation of the CWA in the regulation was not fairly supported by Congress' intent in enacting the CWA. *Id.*; *see also Borden Ranch Partnership v. United States Army Corps of Engineers*, 261 F.3d 810 (9th Cir.2001) (holding that vernal pools which were not adjacent to or in communication with navigable bodies of water, were not subject to CWA jurisdiction). The Supreme Court also held that the Migratory Bird Rule was not entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because the Corps' interpretation of the CWA gave rise to serious constitutional questions concerning the scope of Congressional power under the Commerce Clause, and Congress had not explicitly adopted the Corps' interpretation of the reach of the CWA. *SWANCC*, 531 U.S. at 172, 121 S.Ct. 675 ("When an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result").

Defendants argue that to the extent water from Orcutt Creek does currently flow to the Pacific Ocean, it does so only as a result of pumping. Defendants contend that *SWANCC* dictates that a hydrological connection achieved by artificial means such as pumping between an otherwise isolated body of water and a water subject to the ebb and flow of the tide does not create a nexus sufficient to provide a basis

---

**3.** All citations to regulations in this order are to the Corps' regulations, appearing at 33 C.F.R. Part 323 and Part 328. The EPA's parallel regulations, which are identical in all relevant respects, appear at 40 C.F.R. Part 232.

for Corps regulatory jurisdiction. Defendants also argue that observations made in the Supreme Court's opinion in *SWANCC* strongly suggests that the Corps does not have jurisdiction over wetlands unless they are adjacent to bodies of water which are navigable-in-fact, as opposed to navigable in the sense that they meet the CWA's definition of "waters of the United States."

Plaintiff counters that the holding of *SWANCC* does not apply here because water flowing through Orcutt Creek currently flows past the Betteravia Lakes area into the Santa Maria River and from there into the Pacific Ocean. According to plaintiff, Orcutt Creek is a tributary of waters subject to the ebb and flow of the tide and therefore is itself a water of the United States for purposes of CWA jurisdiction. Plaintiff cites *Headwaters, Inc. v. Talent Irrigation District*, 243 F.3d 526, 533 (9th Cir.2001), for the proposition that the limitation on CWA jurisdiction regarding isolated waters imposed by *SWANCC* does not apply to tributaries of navigable waters. In this regard, plaintiff relies on the Fourth Circuit's decision in *United States v. Deaton*, 332 F.3d 698 (4th Cir. 2003), which distinguishes CWA jurisdiction over nonnavigable tributaries of navigable waters from the isolated waters at issue in *SWANCC* as follows:

> [T]he Corp's regulatory interpretation of the term 'waters of the United States' as encompassing nonnavigable tributaries of navigable waters does not invoke the outer limits of Congress's power or alter the federal-state framework. The agency's interpretation of the statute therefore does not present a serious constitutional question that would cause us to assume that Congress did not intend to authorize the regulation. Indeed, as our discussion of Congress's Commerce Clause authority makes clear, the federal assertion of jurisdiction over nonnavi-

gable tributaries of navigable water is constitutional.

*Deaton*, 332 F.3d at 708.

In light of these arguments, the Court will analyze: (1) whether the Corps has regulatory jurisdiction over Orcutt Creek by virtue of gravity flow of water to "waters of the United States" through pipes running underneath an elevated farm road; (2) whether the Corps has regulatory jurisdiction over Orcutt Creek, assuming, *arguendo*, that Orcutt Creek is an otherwise isolated body of water which is hydrologically connected to "waters of the United States" only by artificial means such as pumping; and (3) whether the Corps has jurisdiction over Orcutt Creek as a wetland adjacent to a body of water which meets the CWA definition of "waters of the United States," but is not navigable-in-fact.

### A. *CWA Jurisdiction Arising from Natural Flow of Orcutt Creek Through Gravity Flow Pipes*

Plaintiff argues that the Corps has regulatory jurisdiction over Orcutt Creek because it is a "tributary" of waters subject to the ebb and flow of the tide. 33 C.F.R. § 328.3(a)(5). For purposes of the CWA, the Ninth Circuit has defined "tributary" as "a stream which contributes its flow to a larger stream or other body of water." *Headwaters, Inc. v. Talent Irrigation District*, 243 F.3d 526, 533 (9th Cir.2001) (quoting *Random House College Dictionary* 1402 (rev. ed.1980)). In *Headwaters*, the Ninth Circuit held that man-made irrigation canals through which water flowed at least occasionally into natural streams that were waters of the United States were subject to CWA jurisdiction as tributaries of those streams. *Id.* at 533. The Ninth Circuit explicitly stated that *SWANCC's* limitations on CWA jurisdiction apply only to isolated waters with no

connection whatsoever to navigable waters:

Our conclusion is not affected by the Supreme Court's recent limitation on the meaning of "navigable waters" in [*SWANCC*] . . . The irrigation canals in this case are not "isolated waters" such as those that the Court concluded were outside the jurisdiction of the Clean Water Act. Because the canals receive water from natural streams and lakes, and divert water to streams and creeks, they are connected as tributaries to other "waters of the United States."

*Id.*

Plaintiff's evidence shows that the waters of Orcutt Creek have been conveyed through the Betteravia Lakes area by means of a man-made earthen channel since at least the early 1990's. Tr. 2/12/03 at 120:11–15; 2/13/03 at 103:17–22; Ex. 580 at 47; Ex. 1038. Plaintiff has also shown that water flowing downstream in Orcutt Creek moves through three gravity-flow pipes, ranging from 30–36 inches in diameter and approximately 40–50 feet long which have been placed through an earthen support for a farm road crossing the channel. Exs. 1033, 1034, 1072; Tr. 2/6/03 at 103:21–104:24; Tr. 2/14/03 at 28:9–15. Plaintiff also has shown that water then flows into a small reservoir to the west of the gravity pipes, which can hold only 6.5 feet acre-feet of water, filling in a few hours during significant storms, such that once the reservoir reaches capacity, water flows further down the Orcutt Creek channel, exiting the western end of the Betteravia Lakes system without being pumped, thereby creating a nonmechanical hydrological connection between Orcutt Creek and the reservoir, and ultimately the Pacific Ocean. *See* Ex. 503 at 15, Tr. 2/12/03 at 62:10–63:8.

Plaintiff characterizes the general pattern of flow in Orcutt Creek as consisting of periods of brief, yet intense, stream flow, often lasting less than five days at a time, in which large volumes of water flow downstream in Orcutt Creek. *See, e.g.,* Tr. 2/06/03 at 84:17–18. There are no gauges at the farm road to measure the flow through the gravity-flow pipes. Tr. 2/14/02 at 21:15–25, 28:9–17. The pipes are on private agricultural land owned by entities not party to the instant litigation, hindering direct measurement of flow through the gravity-flow pipes. *Id.* Plaintiff therefore has relied on measurements of water flow in Orcutt Creek taken at a point where Orcutt Creek passes under Black Road immediately downstream from the Site and upstream from the gravity flow pipes. *See,* Ex. 503 at 6, Tr. 2/6/03 at 14:9–14. Since 1982, the U.S. Geological Survey has maintained a stream gauge at Black Road which automatically records stream flow every 15 minutes. Ex. 503 at 6. Opinions offered at trial by plaintiff's experts regarding the amount of water flowing through the pipes are based on the Black Road data. Tr. 2/7/03 at 41:5–19. Defendants' experts do not dispute the reliability of the Black Road data to indicate existence and amount of the flow in Orcutt Creek at the point at which the Creek passes under Black Road. *See* Tr. 2/14/03 at 156:7–8.

In order to analyze the flow patterns through the gravity-flow pipes, plaintiff's experts, Mitchell Swanson, Lyndon Lee and Wade Nutter, undertook a "mass balance" analysis of the water flowing into and out of the entire Betteravia Lakes area, relying on a topographic survey commissioned by the United States in 2002, of portions of the Orcutt Creek channel and computerized modeling. *See* Ex. 503. In particular, Swanson, Lee and Nutter relied on topographic maps and survey data to calculate the elevations of the gravity pipes and the channel bottom, and the approximate dimensions of the Orcutt Creek chan-

nel. *See* Ex. 503 at 13; Tr. 2/7/03 at 127:3–130:19.

Swanson then used these calculations as inputs for computer modeling using the Hydrological Engineering Center—River Analysis Systems ("HEC–RAS") model.[4] To take into account possible infiltration and evapotranspiration of water in Orcutt Creek between the Black Road gauge and the gravity flow pipes, Swanson relied on published permeability rates of soil types making up the stream bed and published evapotranspiration rates. *See, e.g.,* Tr. 2/7/03 87:17–90:19; Tr. 2/11/03 at 40:18–20; Tr. 2/12/03 at 58:7–14. The net result of Swanson's modeling indicated that 28 acre-feet of flow was needed to saturate the soils in the stream-bed and offset evapotranspiration, leading to flow in the Orcutt Creek channel. Ex. 503, at Table 6; Tr. 2/11/02 at 42:13–17. Based on the dimensions of the channel and the height of the gravity flow pipes, Swanson concluded that an additional 3.2 acre-feet of flow was needed to accumulate water upstream of the farm road, to enable the Creek to reach the elevation of the lowest gravity-flow pipe and begin to flow through the pipe via gravity. Tr. 2/11/03 at 42:8–17.

Swanson and Lee analyzed how water levels in the downstream reservoir would affect flow through the gravity-flow pipes. Plaintiff demonstrated that while water accumulating in the reservoir downstream of the pipes may submerge the lower end of the pipes, water will continue to flow through the pipes so long as the upstream water level is above the downstream level.

*See* Tr. 2/6/03 at 106:7–11; Ex. 503 at 30. Because the mouth of the lowest gravity flow pipe is located at an elevation of 98.89 feet, and the pipe is three feet in diameter, Swanson and Lee both testified that the water level in the downstream reservoir would have to rise to an elevation three feet above 98.89 feet in order to entirely submerge the upstream inlet of the lowest gravity flow pipe, thereby submerging the entire pipe. Tr. 2/6/03 at 104:15–17; 2/12/03 at 62:10–63:8. Because the elevation of the top of the reservoir sill is 100.04 feet, 1.85 feet of water would have to be continuously flowing over the top of the reservoir in order to completely submerge the lowest gravity flow pipe. Tr. 2/6/03 at 106:7–11; Ex. 503 at 30 (Figure 4).

Swanson testified that the presence of "flap gates" at the downstream ends of the gravity flow pipes prevent water pumped into the downstream reservoir during non-storm periods from backing up through the gravity pipes, but that the gates are opened by upstream water pressure, so that they do not obstruct downstream flow. Tr. 2/12/03 at 62:22–63:8. In addition, evidence shows that the flow coming out of a flap gap at the downstream western exit from the Betteravia Lakes area (downstream from the reservoir sill) is not significantly obstructed by brush and other obstructions. *See* Testimony of Milo Ferini at Tr. 2/14/03 at 39:16–23 and 74:21–75:7. Ferini's business regularly removed brush and other obstacles surrounding the flap. *Id.*

4. The HEC–RAS model was developed by the U.S. Army Corps of Engineers at the Hydrological Engineering Center ("HEC") in Davis, California. The HEC–RAS model is used by private sector and governmental agencies to simulate river flow. *See* Tr. 2/20/03 at 16:3–24. The model has been used by the Federal Emergency Management Agency ("FEMA") to set flood insurance rates, and by private sector organizations to design levees and bridges. *Id.* The model is available on the Internet and can be downloaded free of charge. *Id.; see also* <http://www.hec. usace. army.mil/ software/hec-ras/ hecras-hecras.html.> The Army Corps of Engineers also issues a user's manual, an application manual and a hydraulic reference manual to accompany the HEC–RAS software. *See* Tr. 2/20/03 at 18:2–7.

Swanson also analyzed the effect that levee breaches upstream of the gravity-flow pipes would have on the level of water flowing through the pipes. *See* Tr. 2/11/03 at 20–25; Ex. 503 at 10. Swanson testified that flow would continue through the pipes despite a levee breech. *Id.* Swanson determined that in most cases breaches took place only under flow conditions much heavier than the minimum flow necessary to establish flow through the pipes, therefore, the amount of water lost from the channel would not be great enough to eliminate flow through the pipes. Tr. 2/11/03 at 25:25—26:16; Ex. 503 at 10.

Using all the above-referenced data, plaintiff's experts, Swanson, Lee and Nutter, calculated the amount of average daily stream flow needed for water to flow through the gravity-flow pipes. Tr. 2/11/03 at 42:8–17. If saturation requirements in the channel were met, plaintiff's experts concluded that 3 cubic feet per second ("cfs") of flow was needed to initiate flow through the pipes, absent any pumping. *Id.* However, due to the presence of an 18 cfs electric pump in the Orcutt Creek channel with an inlet below the elevation of the lowest gravity pipe, 21 cfs of flow would be needed to initiate flow through the gravity pipes if the pump were operating at full capacity. Ex. 503 at 11, 58; Tr. 2/11/03 at 51:18–22. These conditions were met on a total of 86 days over the period from 1995 to 2001, for an average of 12.3 days of gravity flow per year. Tr. 2/11/03 at 51:10–17. In addition, plaintiff's evidence demonstrates that the actual number of days of gravity flow is more than 12.3 days per year because when the electric pump is not in operation, only 3 cfs of flow is needed to initiate flow through the pipes once saturation requirements are met in the channel. Tr. 2/11/03 at 42:8–17.

Defendants' expert, Elvidio Diniz, testified that plaintiff erred in using the HEC–RAS computer model to calculate flow volumes, and should have used a HEC–1 model instead. Tr. 2/27/03 at 14:3–18. Dinitz testified that to the extent the HEC–RAS model could be used to model stream flow in the case at bar, it was used improperly. Tr. 2/27/03 at 113:16–115:22.

Defendants contend that by limiting the "bank full" channel parameter in the HEC–RAS model to a 50 cfs flow contained within a hydrological bench, Swanson's model yielded an artificially low surface area within the channel for the infiltration and evaporation of water, which resulted in an erroneously high estimate of the amount of flow left in the channel which could move through the gravity flow pipes. *See, e.g.,* cross-examination of Swanson at Tr. 2/26/03 at 31:23–33:10, 42, Post–Trial Brief at 7–10, 15. Defendants contend that Swanson determined the elevation of physical channel forming features used to determine the "bank full" parameter by eyewitness observation rather than survey, and ignored higher portions of the channel as constituting a "flood channel" *See* Tr. 2/11/03 at 78:15–78:20; Tr. 2/20/03 at 34:23–35:7. Therefore, defendants contend that if Swanson had used a different "bank full" parameter, a larger surface area would have been available to absorb water, reducing the water elevation in the channel at the entrance to the gravity flow pipes.

In addition, Diniz testified that concave alignments of channel cross-sections used in the HEC–RAS modeling, as well as other modeling inaccuracies in Swanson's model served to distort the resulting data, reducing water depth in those results. Tr. 2/27/03 at 124; Def. Ex.2050. Diniz testified that Swanson improperly assumed a uniform roughness value for the Orcutt channel, contrary to actual variations in channel roughness, even though the HEC–RAS program would allow a user to input

separate roughness values. *See e.g.* Tr. 2/27/03 at 122. Finally, defendants' soils experts testified that plaintiff's experts arbitrarily made assumptions about the depth of permeable sand deposits in the channel which were too shallow, leading to results that underestimated the amount of flow which would be absorbed in the channel. *See* Tr. 2/7/03 at 78; Tr. 2/13/03 at 122–123.

 The Ninth Circuit in *Headwaters,* and district court decisions following *Headwaters,* have held that jurisdiction may be asserted under the CWA if there is a hydrological connection between a source of pollutants and navigable waters, even in circumstances where that connection is "artificial" rather than "natural." *See, e.g., California Sportfishing Protection Alliance v. Diablo Grande, Inc.,* 209 F.Supp.2d 1059, 1076 (E.D.Cal.2002): "The fact that an underground pipeline conveys the water from one point to the other does not create a hydrological disconnect ..." Therefore, if there is in fact a hydrological connection created by water flowing through the gravity flow pipes at issue herein, it does not matter whether that connection is deemed to be "natural" or "artificial."

 Even without plaintiff's evidence based on the HEC–RAS model, plaintiff offered other evidence to show that water flows downstream through the gravity flow pipes. Milo Ferini, a local landowner whose property is situated on Orcutt Creek, testified that his upstream neighbors pump water from their fields into the Orcutt Creek channel during the summer, and that this water flows under the farm road:

A. [i]f Righetti ... and the Opview Farms has water in this end, they will pump it into the canal, and it will go out. And so rather than having to pump it, it'll flow out ...

Q. During times when your upstream neighbors are pumping for whatever reason into the channel, water can rise high enough to flow from east to west through the gravity flow pipes; is that correct?

A. Yes

Q. Okay. And, in fact, you've seen water moving downstream from east to west through the gravity flow pipes on several occasions; isn't that correct?

A. Yes.

Tr. 2/14/03 at 27:12–19, 68:10–18. This evidence of the flow of water through the gravity pipes as a result of neighbors pumping water into the channel is enough, standing alone, to support a finding that there exists a hydrological connection sufficient to support jurisdiction under the CWA. The fact that water can flow through the gravity-flow pipes as a result of water being pumped into the channel by neighbors above the gravity-flow pipes casts doubt on defendants' contention that water never flows though the gravity-flow pipes as a result of rainfall from large storms. Indeed, undisputed data from the Black Road gauge demonstrates that in March 1995, water in the Orcutt Creek channel at the Black Road gauge was more than 11 feet deep. Ex. 2007 at 29.

In addition, Swanson testified that he had personally observed conditions under which water was passing through the gravity-flow pipes during a storm in December 2002. Swanson testified:

A. "... using my binoculars, I was able to see the outlet pipe to the pump at the farm road. It's a bright orange pipe. And I observed that the reservoir was full ... At that point I watched for 20 minutes, and I did not see the pump discharge or come on at one time ...

Q. Do you know of any way that water could have passed through Betteravia Lakes and reached the roadway and Brown Road without passing through the roadbed?

A. No, There's no other conceivable way that could happen. It has to be through the Orcutt Creek channel and through that structure ...

Q. Okay. Have you formed an opinion with regard to whether the water or much of the water that you observed at Broad Road was passing through the gravity flow pipes on that occasion?

A. Yes.

Q. And what is your opinion? ...

[objection as to lack of foundation overruled]

A. Well, my opinion, given the fact that the inflow greatly exceeded the pump capacity, was that the pump was really not being operated at that time, and that all of the flow was going through the gravity flow pipes for that entire event."

Tr. 2/11/03 at 54: 18–25, 56–58. In light of the testimony by Ferini that he has observed water passing through the gravity pipes, and Swanson's opinion that the flow he had observed in Orcutt Creek had to be passing through the gravity pipes in the absence of any pumping, the Court finds that water does flow by gravity through the gravity flow pipes, and when the reservoir is full—as it was during the December 2002 storm observed by Swanson—water will flow via gravity out of the Betteravia lakes area.

In light of this evidence, the Court concludes that plaintiff has demonstrated by a preponderance of the evidence that water in Orcutt Creek flows by gravity through the gravity flow pipes, over the sill containing the reservoir downstream of the pipes, out of the Betteravia Lakes area and into the Pacific Ocean.

The Court also finds that plaintiff's experts' model of flow through Orcutt Creek produces results which appear on balance to be more reasonable than the alternative modeling proposed by defendants' experts. Defendants' attack on plaintiff's experts' computer modeling relies in part on the contention that plaintiff's experts underestimated infiltration of water into the soil beneath the Orcutt Creek channel. Dr. Scott Stewart, a soils scientist, testified that the soil under a part of the channel at depths greater than six feet was a mix of sand, gravel, silt and clay, slowing infiltration. Tr. 2/7/03 at 77–79, 90. Defendants' expert, relying in part on a 1951 study by the U.S. Geological Survey, concluded that sand deposits in the upper reaches of the channel are approximately 60 feet thick. *See* Tr. 2/13/03 121–128; Ex. 1142. However, plaintiff argues that if defendants' infiltration analysis were assumed to be accurate, the amount of water that could be absorbed in the upper reaches of Orcutt Creek in a single day would exceed the total amount of water that flowed in Orcutt Creek in the entire year of 2001. *See* Ex. 580 at 74, as amended by Ex. 2027; Tr. 2/13/03 at 142:7–15. Therefore, defendants' experts' analysis appears to be directly contradicted by the flooding of Orcutt Creek in early March of 2001. *See e.g.* Ex. 1018 (aerial photographs of the flooding). Indeed, defendants' expert, Dr. Straw, withdrew part of his conclusion on cross-examination:

Q. ... Your report, as it stands before the Court then is admittedly—grossly overstates that infiltration in Reach I, doesn't it?

A. For the two larger storms, that is correct.

Tr. 2/13/03 at 142–143.

Therefore, the Court finds that plaintiff's experts' modeling of water flow is corroborated by the eye-witness testimony of Ferini and Swanson.[5] In light of the

---

5. In light of the Court's findings, the Court denies defendants' motion to strike Swanson's expert testimony.

Court's finding that water passes by gravity through the gravity flow pipes, and flows via gravity out of the Betteravia lakes area, the Court finds that a hydrological connection exists sufficient to support the Corps' jurisdiction under the CWA.

### B. CWA Jurisdiction Arising from Pumping Water in Orcutt Creek

 Plaintiff contends that the Corps has regulatory jurisdiction over Orcutt Creek, pursuant to 33 C.F.R. § 328.3(a)(5), as a "tributary" of a water subject to the ebb and flow of the tide, even if water flows out of Orcutt Creek only as a result of pumping. In *Headwaters*, the Ninth Circuit held that tributaries through which water flows intermittently or which consist of artificial structures like irrigation canals may nonetheless be waters of the United States.[6] Plaintiff relies on *Headwaters*, and district court cases following *Headwaters* to argue that pollutants in Orcutt Creek are just as capable of causing environmental damage to the Santa Maria River if the pollutants reached the Santa Maria River by virtue of pumping rather than natural flow. Plaintiff argues that Orcutt Creek should be considered a water of the United States even if the Court were to find that its waters only reach the Santa Maria River and Pacific Ocean as a result of pumping.

Defendants contend that it would be unreasonable to consider a stream from which water was pumped into a second body of water, rather than flowing into it by natural means, to be a tributary of that second body of water. Defendants contend that, apart from the result of pumping, Orcutt Creek is an isolated, nonnavigable, body of water located entirely within the state of California, which, according to both *SWANCC* and *Headwaters*, should not be deemed subject to Corps' jurisdiction. Defendants contend that flow caused by pumping should be characterized under the CWA as a point source discharge rather than tributary flow, particularly when that flow is controlled by a private entity. Defendants rely on *Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1297 (1st Cir.1996), in which the First Circuit concluded that where "water leaves the domain of nature and is subject to private control rather than purely natural processes . . . it has lost its status as waters of the United States."

It is undisputed that water from Orcutt Creek is pumped under the farm road. *See* Defendants' Contentions of Fact and Law at 32; Tr. 2/14/03 at 64:4–20. Milo Ferini testified that the pump is used frequently during periods of high stream flow, and at times operates 24 hours a day, and during extremely wet years has operated continuously for up to 45 days at a time. Tr. 2/14/03 at 62:18–20, 63:1–5, 64:4–20. Defendants do not contest the fact that a hydrological connection between the downstream side of the farm road and the Pacific Ocean exists by virtue of gravity. *See* Defendants' Contentions of Fact and Law at 32; Tr. 2/6/03 at 28:1–3.

The Ninth Circuit and a majority of courts that have addressed the issue have concluded that the existence of a hydrolog-

**6.** The Ninth Circuit declared:

> The irrigation canals in this case are not "isolated waters" . . . Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage . . . [I]t makes no difference that a stream was or was not at the time of the spill discharging water continuously into a river navigable in the traditional sense. Rather, as long as the tributary would flow into the navigable body [under certain conditions], it is capable of spreading environmental damage and is thus a "water of the United States" under the Act.
>
> *Headwaters*, 243 F.3d at 533, 534.

ical connection does not turn on a distinction between the "natural" flow of water and the "artificial" flow of water. In *Headwaters*, 243 F.3d at 533, the Ninth Circuit held that because artificial irrigation canals "receive water from natural streams and lakes, and divert water to streams and creeks, they are connected as tributaries to other 'waters of the United States.'" A district court recently rejected a distinction between "artificial" flow and "natural" flow, stating, "[t]he fact than an underground pipeline conveys the water from one point to the other does not create a hydrological disconnect ..." *California Sportfishing Protection Alliance*, 209 F.Supp.2d at 1076.

Further, in *United States v. New Portland Meadows, Inc.*, No. 00–507–AS, 2002 WL 31180956 (D.Or.2002), the court determined that pumping alone can create a hydrological connection sufficient to support CWA jurisdiction:

> The mere fact that the water from the District ditches is forced into the Columbia Slough by pumps is irrelevant. All of the water that enters the District ditches eventually ends up in the Columbia Slough, whether it flows naturally or not. Defendants were well aware of the ultimate destination of their wastewater and created their ditch system with the intent that the wastewater be transported to the Columbia Slough.

*Id.* at *6. *See also United States v. Saint Bernard Parish*, 589 F.Supp. 617 (E.D.La. 1984), holding that pumping water from a canal into a wetland connected to navigable waters establishes a hydrological connection creating CWA jurisdiction.[7]

The fact that pumping is intermittent and non-continuous does not affect whether a hydrological connection exists. "Even tributaries that flow intermittently are 'waters of the United States.' ... 'Pollu-

tants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage ...' " *Headwaters*, 243 F.3d at 534, quoting *Eidson*, 108 F.3d at 1342. *See also Community Association for Restoration of the Environment v. Bosma*, 305 F.3d 943 (9th Cir.2002). Consequently, even if water flows out of Orcutt Creek only as a result of its being pumped, the Court nonetheless finds that the Corps has regulatory jurisdiction over Orcutt Creek pursuant to 33 C.F.R. § 328.3(a)(5) as a "tributary" of a water subject to the ebb and flow of the tide.

C. *CWA Jurisdiction Arising From Wetlands Adjacent to Waters of the United States Which Are Not Navigable In Fact*

In *SWANCC*, the Supreme Court construed the term "navigable" for purposes of determining whether CWA jurisdiction exists:

> This is not the first time we have been called upon to evaluate the meaning of § 404(a). In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), we held that the Corps had § 404(a) jurisdiction over wetlands that actually abutted on a navigable waterway. In so doing, we noted that the term " 'navigable' is of 'limited import'· and that Congress evidenced its intent ·to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Id.* at 133, 106 S.Ct. 455. But our holding was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters. *See id.* at 135–39, 106

---

**7.** In view of the Ninth Circuit's decision in *Headwaters,* any contrary view expressed by the First Circuit in *Dubois* is not controlling here.

S.Ct. 455. We found that Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands "inseparably bound up with the 'waters' of the United States." *Id.* at 134, 106 S.Ct. 455.

It was the significant nexus between the wetlands and "navigable waters" that informed our reading of the CWA in *Riverside Bayview Homes.* Indeed, we did not "express any opinion" on the "question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of open water . . . ." *Id.* at 131–32 n. 8, 106 S.Ct. 455. In order to rule for respondents here, we would have to hold that the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water. But we conclude that the text of the statute will not allow this.

*SWANCC,* 531 U.S. at 167–68, 121 S.Ct. 675. Based on *SWANCC,* defendants contend that wetlands on the Site adjacent to Orcutt Creek are not subject to Corps jurisdiction because Orcutt Creek is not "open water," since Orcutt Creek is not "navigable in the classical sense of the term" *i.e.* navigable-in-fact. Plaintiff, by contrast, contends that *SWANCC* only excludes isolated, nonnavigable bodies of water such as the ponds at issue in that case from the scope of the CWA. Plaintiff contends that jurisdiction exists under CWA § 404(a) where a wetland abuts a nonnavigable tributary of a traditionally navigable stream.

In *Headwaters,* the Ninth Circuit interpreted *SWANCC* 's jurisdictional limitation as applying to "isolated waters," *id.* at 533, and that nonnavigable, intermittent "tributaries" of navigable waters may continue to be considered waters of the United States subject to the Corps' jurisdiction. *Id.* Following *Headwaters,* another district court in this circuit stated, "[a] determination that a pond adjacent to a navigable body of water is protected by the Clean

Water Act is consistent with both the more limited reading of the Fifth Circuit and the more expansive reading of the Ninth Circuit." *San Francisco Baykeeper v. Cargill Salt Div.,* 2003 U.S. Dist. LEXIS 8247, *19 (N.D.Cal.2003).

The Seventh Circuit addressed the issue of whether the scope of adjacency jurisdiction extends to wetlands adjacent to nonnavigable waters, in the context of a challenge to the validity of a consent decree after the Supreme Court decided *SWANCC. See U.S. v. Rueth Development Co.,* 335 F.3d 598, 604 (7th Cir.2003). The Seventh Circuit stated:

> [I]t is clear that *SWANCC* did not affect the law regarding ... [CWA] jurisdiction ... under § 230.3(s)(7). The Corps' adjacency jurisdiction is well-established; it was upheld by the Supreme Court in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), and was reaffirmed in *SWANCC.*

*Rueth Development Co.,* 335 F.3d at 604. The Seventh Circuit stated further that, "[i]n *Riverside Bayview Homes,* the Court found mere surface runoff nearby navigable waters to be a meaningful enough connection to give rise to Corps' adjacency jurisdiction." *Id.,* citing *Riverside Bayview Homes,* 474 U.S. at 134, 106 S.Ct. 455.

In *Deaton,* the Fourth Circuit interpreted the impact of *SWANCC* in the context of an enforcement action in which the "Corps assert[ed] jurisdiction over the Deatons' wetlands because they [were] adjacent to [a] roadside ditch, which is a tributary of the Wicomico River, a traditional navigable water." *United States v. Deaton,* 332 F.3d 698, 704 (4th Cir.2003). The Fourth Circuit stated that:

> Water from the roadside ditch takes a winding, thirty-two mile path to the Chesapeake Bay. At the northwest edge

of the Deaton's property, the roadside ditch drains into a culvert under Morris Leonard Road. On the other side of the road, the culvert drains into another ditch, known as the John Adkins Prong of Perdue Creek, Perdue Creek flows into Beaverdam Creek, a natural watercourse with several dams and ponds. Beaverdam Creek is a direct tributary of the Wicomico River, which is navigable.

*Id.* The Fourth Circuit observed that several courts have held that *SWANCC* limited the holding of *Riverside Bayview Homes* to wetlands adjacent to traditional navigable waters. *Id.,* citing, *e.g., D.E. Rice v. Harken Exploration Co.,* 250 F.3d 264, 268–69 (5th Cir.2001). However, the court in *Deaton* did not address the issue of the scope of adjacency jurisdiction under the CWA in light of *SWANCC,* noting that "[t]he Deatons do not press that limitation [of *SWANCC* on *Riverside Bayview Homes* ] here." *Deaton,* 332 F.3d at 704. Instead, the defendants in *Deaton* argued that the the Corps lacked jurisdiction on the grounds that the roadside ditch itself could not be subject to jurisdiction under 33 C.F.R. § 328.3(a)(5), as a tributary under the CWA. *Deaton,* 332 F.3d at 704.

In *Treacy v. Newdunn Associates, LLP,* 344 F.3d 407, 415, n. 5 (4th Cir.2003), the Fourth Circuit reached the question of adjacency jurisdiction that had been reserved by the *Deaton* court. In *Newdunn Associates,* the Fourth Circuit stated that the "insistence that *SWANCC* limited the Corps' jurisdiction solely to those wetlands adjacent to navigable waters-in-fact is plainly incorrect," reasoning that "[u]nlike the administrative regulation at issue in *Riverside Bayview Homes,* the 'Migratory Bird Rule' before the Court in *SWANCC* was not developed to clarify the 'scientifically nebulous point at which water ends

and land begins.' " *Newdunn Associates,* 344 F.3d at 415, n. 5, citing *Riverside Bayview Homes,* 474 U.S. at 134, 106 S.Ct. 455.

Neither the Ninth Circuit in *Headwaters,* nor the district court in *San Francisco Baykeeper* reached the issue of whether adjacency jurisdiction under § 404(a) of the CWA extends to wetlands adjacent to any tributary, navigable or non-navigable, which is hydrologically connected under certain conditions with a body of water that is "navigable" within the classical understanding of that term. However, the Court finds the decisions by the Seventh Circuit in *Rueth Development Co.,* and the Fourth Circuit in *Newdunn Associates* to be persuasive. Therefore, the Court concludes that the waters of Orcutt Creek upstream of the gravity flow pipes are "wetlands adjacent" to "waters of the United States" pursuant to 33 C.F.R. § 328.3(a)(7).

## IV. CONCLUSION

For the reasons set forth above, the Court finds and concludes that CWA jurisdiction exists over the present controversy.[8]

IT IS SO ORDERED.

---

8. Any finding of fact determined to be a conclusion of law is hereby adopted as such and any conclusion of law determined to be a finding of fact is hereby adopted as such.